THE PEOPLE, *ex rel.* PETER CUNNINGHAM AND SIXTY-TWO OTHER CITIZENS OF UTICA, Respondents, *v.* ISAAC ROPER and others, Assessors of the City of Utica, Appellants.

The power of taxation was committed by the people to the government to be exercised, and not to be alienated.

The State cannot impose taxes on property, securities or franchises, exempted by an authority to which it is itself subordinate, by the terms of the federal Constitution.

It may invite investment for the benefit of the public, in a particular description of property, by stipulating for its exemption in the hands of the holders, from assessment as a subject of general taxation.

But it is never to be assumed that the State has fettered its power of taxation in the future, even to this extent, unless it appears, with irresistible clearness, that the enactment was intended to be in the nature of a private contract, as distinguished from a mere act of general legislation.

The provision in the general militia act of 1854, tendering limited immunity from taxation to members of certain volunteer companies, was designed only as an ordinance of the law-making power, on matters pertaining to the municipal interests of the State; and it was subject, from its very nature, to amendment or repeal by the legislative authorities, to which those interests are committed as a continuing charge.

The repeal of the provision involved no breach of obligation on the part of the State; for the faith reposed by the citizens, who accepted the tender, was on the stability of a public law, and not on the efficacy of an irrevocable agreement.

The claim of a particular citizen to personal immunity from taxation, from jury duty or military duty, is not a right of property, and has none of the distinctive characteristics of that class of interests which are susceptible of possession or ownership.

The prohibition in the federal Constitution against the passage of laws impairing the obligation of contracts, has reference to contracts by which obligations are imposed, and rights of property are vested or secured.

It was not the purpose of the provision to impose on the courts the duty, either of interposing between the legislature and the citizen in matters of pure governmental concern, of trammeling the States in the exercise of their general political powers, or of stamping municipal regulations for the time being, with the seal of irrevocability.

MANDAMUS to compel the defendants, as assessors of the city of Utica, to deduct $500 from the assessed value of the property of each of the relators on the assessment rolls of that city.

This reduction was claimed on the ground that the relators had respectively served seven years in the militia; that they had been honorably discharged; and that they were, accordingly, entitled to perpetual immunity from taxation, to the extent of $500 each, under a former provision of the general militia law. (Laws of 1854, p. 1044, § 15.) It was resisted, on the ground that, under existing laws, the assessors were bound to enter upon the assessment roll the value of the relators' property, as they did in all other cases, and that the provision, under which such a reduction had been authorized, in 1854, was repealed in 1865. (1 R. S., 5th ed., 909, §§ 8, 9; id., 913, § 25; Laws of 1862, 911, § 146; Laws of 1865, 1261, § 1; id., 1265, § 146.)

At a Special Term, held before Mr. Justice MORGAN, the application for a mandamus was denied. The order was reversed at a General Term held in the fifth judicial district, and it was adjudged that the relators were entitled to a peremptory mandamus. From that decision, the assessors appealed to this court.

*Francis Kernan*, for the appellants.

*Roscoe Conkling*, for the respondents.

PORTER, J. The decision of this case must be controlled by the application of familiar principles of statutory construction and constitutional law. If specific contracts had been entered into with each of the relators, with the concurrence of all the State authorities for the time being, agreeing severally with each that, if he would volunteer to equip himself and perform militia duty at stated periods during the next seven years, he should thenceforth be released from *all future obligations* due from him as a citizen to the government, it would be material to consider the question whether the people had clothed their agents with authority to enter into such an engagement. The mere fact, that there was the form of a contract, and that those who made it *intended* that it should be, not only operative, but indissoluble, would not, necessarily, bring it within the protection of the Federal Constitution.

The clause in that instrument, which prohibits the passage of State laws "impairing the obligation of contracts," applies only to contracts which *impose* obligations under the general principles of law. It does not extend to those which are void in their origin under the State Constitution, nor to those entered into without authority from the party sought to be bound. We find nothing, in the decisions of the State or the federal courts, which leads us to suppose that such a contract could be enforced after legislative revocation.

In the present case, the claim is limited to a *partial* release of the citizen from his future obligations to the government, as a promised reward for voluntary and meritorious services. It is substantially conceded that they were services which the State had a right to command, and that the only evidence of its purpose to acknowledge them by a future gratuity, is to be found in a provision of the general law, which it had an undoubted right to repeal. It is claimed, however, that the law, thus repealed, contained, within itself, an irrepealable contract, imposing obligations on the State which the federal courts are bound to enforce.

We do not think it necessary to consider the question, whether the legislature would have exceeded its authority, in entering into a contract like that claimed by the relators, as we have arrived at the clear conclusion that the provision in question is to be construed, in accordance with its manifest intent, as a mere act of ordinary legislation, subject to future amendment or repeal, and not as a private contract between the State and the citizen.

The clause is found in one of the general laws, which have been adopted from time to time, to regulate the enrollment and organization of the State militia. (Laws of 1854, 1044, § 15.) It was repealed at a time when the burden of taxation, entailed upon the people by the recent war, made it necessary, in the judgment of the legislature, that those who had been relieved under this provision from proportionate annual contribution, should henceforth be charged with their ratable quota toward the support of government and the payment of the public debt. (Laws of 1865, 1265, § 146.)

The law of 1854 declared that all white male citizens, between the ages of eighteen and forty-five, with certain specified exceptions, should be subject to military duty. Looking to the general purposes of the act, and the framework of its provisions, we find that its practical effect was to relieve the great mass of our citizens from the performance of the duty thus imposed, on condition of the payment of the sum of fifty cents each per annum, for the benefit of the uniformed militia. This was an appropriate exercise of the pure law-making power; and we think there is no just reason for supposing that the legislature intended by it something more, in the nature of an irrevocable contract, either with those electing to serve, for perpetual exemption from taxation, or with those electing to pay, for perpetual exemption from military duty.

It has been the practice of each of the State governments to apportion the burdens devolving upon its citizens, with a view to considerations affecting the general welfare, and to readjust such apportionments from time to time, as the public exigencies required. In our own State, each successive statutory scheme for the distribution of these burdens has been regarded as a complete and dependent system, operative in all its parts so long as it stood unaltered and unrepealed, but, like other general laws, subject to amendment or revocation by future legislation. If there be any department of the government in which this continuing authority is vitally essential to our existence, it is in the organization of our military force, on which we rest our ultimate dependence for the preservation of order, the enforcement of the laws, and our common security whether in peace or in war. It is true that the instances are rare, on which we have occasion to invoke the aid of this right arm of our strength, but it is because it is an ever present authority, at the command of those who are intrusted by the people with the administration of the laws.

So, too, of the powers of taxation. The rights and obligations of the citizen and the government are mutual and correlative; and there is no power which can absolve the

one from his allegiance, so long as he retains his claim on the other for protection. In a representative democracy, the right of taxing the citizen is an inseparable incident of popular sovereignty; and this power is committed to the government to be exercised, and not to be alienated. It is true that a State cannot tax property or securities exempted by an authority to which it is itself subordinate, within the terms of the federal compact. It is also true that, for adequate considerations, and in the exercise of its general authority, it may invite investments in a particular description of property for the benefit of the State, by stipulating for its exemption, in the hands of the holders, from assessment as a subject of general taxation. (*State Bank of Ohio* v. *Knoop*, 16 How. U. S., 369; *Ohio Life Insurance and Trust Company* v. *Deboit*, id., 416; *Gordon* v. *Appeal Tax Commissioners*, 3 id., 144.) It is never to be assumed, however, that the State has, even to this extent, fettered its power in the future, except upon clear and irresistible evidence that the engagement was in the nature of a private contract, as distinguished from a mere act of general legislation; and that such, in the particular instance, was the actual and deliberate intention of the State authorities.

" That the taxing power is of vital importance," said Chief Justice MARSHALL, in the case of the *Providence Bank* v. *Billings*, " that it is essential to the existence of government — are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but, as the whole community is interested in retaining it undiminished, that community has a right to insist that *its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear*." In a subsequent passage of the same opinion, he adds: " The power of legislation, and, consequently, of taxation, operates on all the persons and property belonging to the body politic. This is an original

principle, which has its foundation in society itself. It is granted by all, for the benefit of all. It resides in government as part of itself, and need not be reserved, when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. *However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens; and that portion must be determined by the legislature.*" (4 Peters, 561, 562.) "The sovereignty of a State," as the same great judge said on another occasion, "extends to everything which exists by its own authority, or is introduced by its permission." (4 Wheaton, 429.)

If such are the settled rules of presumption applicable to stipulations in charters to private corporations, in regard to the exemption of particular descriptions of property, with how much more force do they apply to a provision, like that in question, embodied in a general statute, under which it is claimed that a large class of citizens are absolved, within certain specified limits, not only so long as the State wills, but in perpetuity, though the State wills otherwise, from all obligation to pay future taxes on any description of property whatever.

For an irrepealable contract of such a nature, in the name of the body politic, no authority is found, either in our legislative or our congressional precedents. A contract in a corporate charter, for immunity in respect to a franchise conferred by government, is essentially distinct in its nature, from a prospective absolution of the citizen from his future obligations to the State. An act of congress, declaring the securities of the United States to be exempt from taxation in the hands of the holders, rests upon very different principles of public law, from an act which should tender to any party, making a loan to the government, personal and perpetual immunity from future State taxation in respect to his general property.

There is no intendment in favor of the abdication, by the people, of the general and inherent authority to impose taxes on every citizen. They have sanctioned no such relinquish-

ment by their agents, either in the State or the federal Constitution, and these are the only authentic acts, in which to seek a warrant for the surrender of sovereign powers, essential to State and national existence.

In exercising the power of apportionment, it has been usual with us, as with other governments, to relieve certain classes of persons from the pressure of burdens, which, for special reasons, would be, as to them, peculiarly onerous; and this has been done as an incident in the adjustment of general statutes, and on such terms as seemed good to the law-making power for the time being; but it has never been our policy to enter into irrevocable contracts, securing to individuals or classes, as against the State, special privileges and immunities not granted to other citizens, and opposed to the theory of the Constitution. In the language of Chief Justice MARSHALL, which, since its utterance, has acquired the authority of a maxim of constitutional law : " Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, *the legislative intention must be expressed with irresistible clearness*, to induce a court of justice to suppose a design to effect such objects." (2 Cranch, 390.)

It is true that the State may, if it will, within the limits prescribed in its organic law, enter into private contracts with its citizens, by which the people and the government are forever bound; but we are never to construe a general statute as embracing such a purpose, when it is obvious that it was designed only as an expression of the legislative will for the time being, in a matter of mere municipal regulation. When this is the object of the law, those who act upon the faith of its provisions, do so with a reasonable assurance, indeed, that it will not be modified or repealed until such action shall be required, in the judgment of the legislature, by the general interest of the community; but with notice that it is subject to revocation by the State, whenever the public exigencies may demand. Such a repeal involves no breach of obligation, in the sense of the federal Constitution;

for the faith reposed is on the stability of a general law, and not on the efficacy of a legal contract.

The legislature of 1854, admonished of the inefficiency of the antecedent militia system, was engaged in devising another, with reference to the general interests of the State. It is not to be supposed, that while they were repealing that matured by their predecessors, they anticipated perpetuity for their own. They were sweeping away old provisions and substituting others, subject to be swept away in turn by their successors. They obviously had no purpose or thought of bargaining away for the future, the very powers they were exercising in revising the work of the past; and these relators had no right to infer from the general terms of the law, that by rendering services under it, they could place themselves, in respect to taxation, beyond the control of the State government. The framers of the statute under consideration were public men, understanding the nature of the duties in the discharge of which they were engaged. They were apportioning the public burdens, with reference to the common interest and the existing condition of affairs. They were perfecting the laws, and not scattering contracts broadcast through the State, in abridgement of their own political powers, and of rights inherent in the people, by whom legislatures are created and Constitutions ordained.

It is not every declaration of the present will of the sovereign, which constitutes a contract with the individual citizen. Mere forms of expression are often indecisive or illusory, in determining the nature and purpose of a provision detached from its place in a general statute. The imperfection of human language is such, that it is not always easy to declare the will of the legislature, in matters affecting individual interests, in terms which would not be equally applicable in an instrument, declaring the concurring wills of two contracting parties; but it no more follows necessarily that a law is intended as a contract, from the use of language appropriate to a private agreement, than that a contract is intended by the parties who make it as a law, from the use of phrases equally appropriate in a statute. The language

should be construed with reference to those who use it, the subject to which they apply it, the context in which it is found, and the purpose for which it is employed. No law could well be framed in terms more appropriate to a contract, than that which secures, on certain prescribed conditions, the exemption of a debtor's homestead; but this court entertained no doubt of the power of the legislature to amend it by inserting further conditions. (15 N. Y., 495.) No language could well be framed more apt for the purposes of an agreement, than that of our former State Coustitution as to the tenure of judicial office; but it would be a grave error to suppose that it constituted a contract with the incumbents, in the sense of the federal Constitution.

There was no motive on the part of the legislature for entering into indissoluble engagements, of the nature supposed by the relators. The theory of our government is, that it is ordained by the people and for the people; and that the citizens of the State, as a class, are ready to acquiesce in their own laws, and to discharge every duty essential to the maintenance of the authority they have ordained, whether connected with public order and the common defense, with the administration of justice, or with the ways and means to be provided for the due execution of the laws. Hitherto, we have had no occasion in our State history to distrust the soundness of this theory, on which our institutions rest; and it would have been a startling departure from our settled policy, if any State legislature had proposed to purchase obedience to the laws, by sale of its own political powers.

The inducements held out in the statute of 1854, were tendered by the government and accepted by the citizens, as incident to a system which the State had power to revoke. There are few of the various rights, thus springing as mere incidents from the operation of general laws, which can be placed on a footing of absolute security against all future legislation. Instances occur, from time to time, of provisions embodied in our public statutes, beneficial to meritorious persons and classes, which prove inconsistent with the common welfare and prejudicial to the general interests of society.

It would be alike unfortunate and dangerous to construe such laws, as in the nature of civil contracts with each person benefited by their provisions; when they are manifestly designed as mere ordinances of the law-making power, on matters pertaining to the general interest, and subject, from their very nature, to future amendment or revocation, by the authority to which these interests are committed as a continuing charge. (*Metropolitan Board of Excise* v. *Barrie*, 34 N. Y., 657, 668.)

If the theory of the relator could be maintained, the particular provision relied on would be made, in effect, to survive, not only its own repeal, but that of the system in which it was embodied; and, though adopted only as part of a scheme of general legislation, it would be made to operate by indirection, as a surprise upon the intent of the framers, and be converted into an irrevocable contract between the government and the citizen, whose services it had a right to command; though it chose to recognize and reward them by special privileges, which it was then convenient to confer, but which, in a changed condition of affairs, a regard for the common good did not permit the State to perpetuate.

The proposition, urged by the counsel for the relators with great force and ability, that the repeal of the provision in question, leaves untouched the antecedent rights vested in the relators, rests on the assumption, in which we do not concur, that the enactment was in the nature of a contract, as distinguished from a mere act of legislation. The exemption, if revocable, was revoked, and by the same authority from which it was derived. (*Butler* v. *Palmer*, 1 Hill, 324; *Hartung* v. *The People*, 22 N. Y., 102.)

We are also of opinion that, irrespective of the question of construction, the provision for the personal exemption of the relators from taxation, within the specified limits, does not fall within the scope of the constitutional prohibition against laws impairing the obligation of contracts.

In the language of the Supreme Court of the United States: " The contracts designed to be protected by the tenth section of the first article of that instrument, are contracts by which perfect rights, *certain, definite, fixed, private rights*

*of property*, are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or State government for the benefit of all, and from the necessities of the case, and according to universal understanding, to be varied, or discontinued as the public good shall require." (*Butler* v. *Commonwealth of Pennsylvania*, 10 How. U. S., 416.)

Where a State has, by contract, exempted a particular description of property from taxation, a violation of the contract is within the scope of the inhibition; but the personal immunity claimed by the relators against the power of a State government to tax its citizens, is not the subject of constitutional protection, within the intent of the restraining clause. A claim of personal exemption from taxation, from jury duty or military duty, is not in the nature of a right of property or a corporate franchise. It is not the subject of alienation or succession, and has none of the distinctive characteristics of that class of interests which are susceptible of possession or ownership. It is more nearly akin to the claim of a public officer, to the continuance of the compensation attached to the position by law, at the time its duties are assumed, than to a private contract with the government in the sense of the Constitution. In respect to the rights vested in the incumbent of an office, it has been repeatedly adjudged, that they are held subject to the authority of the legislature to diminish the compensation, to impose additional duties, or even to abolish the office, and thus terminate at once the powers and rights of the incumbent. (*Butler* v. *Commonwealth of Pennsylvania*, 10 How. U. S., 402; *Connor* v. *Mayor of New York*, 2 Sand., 355; *S. C.* affirmed, 1 Seld., 285.)

It was not the purpose of this provision in the Constitution to impose on the courts the duty, either of interposing between the legislature and the citizen in matters of pure governmental concern, of trammeling the States in the exercise of their general political powers, or of stamping municipal regulations for the time being with the seal of irrevocability.

It follows from these views that the assessors were guilty of no wrong, in refusing to violate the mandates of existing statutes, by making assessments on the basis of a law which had previously been repealed.

The order made at the General Term, and the judgment founded thereon, should be reversed, and the order at Special Term, denying a mandamus, should be affirmed.

All the judges concurring, except HUNT, J., who dissented,
Judgment accordingly.