The People agt. Long Island Railroad Company.

# SUPREME COURT.

THE PEOPLE OF THE STATE OF NEW YORK agt. THE LONG ISLAND RAILROAD COMPANY and THE ATLANTIC AVENUE RAILROAD COMPANY OF BROOKLYN.

*Railroads — Right of defendants to use steam power upon Atlantic avenue in the city of Brooklyn — Constitutional law.*

The Long Island Railroad Company was incorporated April 24, 1834 (*chap.* 178, *Laws of* 1834), and by virtue of an act of the legislature, passed April 2, 1836 (*chap.* 94, *Laws* of 1836), it, on the first day of December, 1836, leased a road belonging to the Brooklyn and Jamaica Railroad Company, a corporation formed under chapter 256 of Laws of 1834. Until the consummation of the proceedings had under· and in pursuance of chapter 484 of Laws of 1859, the Brooklyn and Jamaica railroad and its lessee, the Long Island Railroad Company, had a right to operate a railroad by steam over and upon lands, the principal part , of which is now Atlantic avenue, in the city of Brooklyn. When the act of 1859 was passed, the defendant, "The Long Island Railroad Company," reached the East river by a tunnel under the surface of Atlantic avenue. The act of 1859 (*chap.* 484, *Laws* of 1859) was entitled "An act to provide for the closing of the entrances of the tunnel of the Long Island Railroad Company in the city of Brooklyn, and restoring said street to its proper grade, and for the relinquishment by said company of its right to use steam power within said city." The provisions of this act were substantially carried out. The agreement of the commissioners appointed under the act of 1859, providing for the closing of the tunnel and the surrender of the right to use steam upon the avenue, was with the Brooklyn and Jamaica Railroad Company, who, as the lease originally executed by them to the Long Island Railroad had been surrendered, are styled therein " the assignees of the Long Island Railroad Company, within the true meaning and intent of both the said acts," to wit, the said act of 1859, and another relating to the same subject, passed March 23, 1860. The contract required the tunnel to be closed, and the various things done which the law of 1859 enjoined, and the Brooklyn and Jamaica Railroad Company relinquished " its right to use steam within the corporation limits of the city of Brooklyn," and agreed that " steam power shall not be used or permitted upon its road, or any part thereof, within the limits of the city of Brooklyn," after the happening of an event specified in

The People agt. Long Island Railroad Company.

the agreement. To this contract the Long Island Railroad assented, "so far as it has any right so to do, and so far as it has any interest therein." The compensation which the Brooklyn and Jamaica Railroad Company received under this agreement was $125,000, which was levied upon a district prescribed by the said act of 1859, and which was supposed to be specially benefited by the abandonment of the use of steam power upon Atlantic avenue. On April 5, 1855, the Brooklyn and Jamaica Railroad Company executed to Samuel Willetts, Robert Ray and Alexander Hamilton, Jr., as trustees, a mortgage to secure its bonds to the amount of $100,000. This mortgage covered all its property, including that leased to the Long Island Railroad Company. On the 21st of March, 1872, a decree of sale (in a suit to foreclose this mortgage) was made, such sale to be " subject to a certain agreement or release made between the Brooklyn and Jamaica Railroad and the Long Island Railroad Company, dated April, 1860 " (it being an agreement between those two companies, and not the one between the Brooklyn and Jamaica Railroad Company and the commissioners appointed under the act of 1859), " and subject also to the provisions of the act of 1859," and subject also to the provisions of a certain other act passed April 16, 1860, entitled "An act authorizing the Brooklyn Central and the Brooklyn and Jamaica Railroad Companies to consolidate, and continue their roads so far as such provisions of said acts relate to the closing of the tunnel in Atlantic street, in the city of Brooklyn, and the relinquishment of steam power within the limits of said city." Under this decree of foreclosure the property of the Brooklyn and Jamaica Railroad was sold, and one William Richardson became the purchaser, the property being bought subject to the condition contained in the decree. On the 29th day of April, 1872, in pursuance of the act, entitled " An act to authorize the formation of railroad corporations and to regulate the same," passed April 2, 1850, a railroad corporation was formed under the name of "The Atlantic Avenue Railroad Company of Brooklyn." To this corporation, on the 28th day of February, 1874, William Richardson, the purchaser at the foreclosure sale, conveyed the property bought thereat, and which in the deed is described as "all and singular the railroad of the Brooklyn and Jamaica Railroad Company, extending from its commencement at the ferry at the foot of Atlantic street, in the city of Brooklyn, in Kings county, to its termination in the village and town of Jamaica, in the county of Queens, including all its appendages and the depot lots in the village of Bedford, and the right to construct branches to Flushing or Flatbush, as secured to the said The Brooklyn and Jamaica Railroad Company by their act of incorporation." On the 26th of March, 1877, the Atlantic Avenue Railroad Company leased to the Long Island Railroad Company, " its successors and assigns, all the railroad of the

The People agt. Long Island Railroad· Company.

party of the first part, extending from its eastern terminus in the village of Jamaica, westward to the city line of the city of Brooklyn in Atlantic avenue, and thence along said avenue to a point in Atlantic˜ avenue in˙ the city of Brooklyn, 250 feet east of the easterly line of Flatbush avenue, said 250 feet to be measured along a line in the centre of Atlantic avenue," and also sundry other property as is in the lease specially provided. By chapter 187 of the Laws of 1876, it was declared "it shall be lawful for the Atlantic Avenue Railroad Company of Brooklyn, and for the Long Island Railroad Company, as lessee from the Atlantic Avenue Railroad Company of Brooklyn, of that part of the railroad of said Atlantic Railroad Company which extends from the junction of Atlantic and Flatbush avenues, in the city of Brooklyn, eastwardly along said Atlantic avenue, to the city line, to run cars over said railroad, upon Atlantic avenue, from the city line of Brooklyn to Flatbush avenue, by steam· power, ˙subject to such rules and regulations as to rate of speed and public safety "as from time to time the common council of the city of Brooklyn may prescribe." Under this law the defendants were, when this suit was commenced, adapting and changing the horse railroad track to that of a steam railway, and are now propelling cars thereon by steam. Against this the plaintiffs ask an injunction, because, as they allege, by the acts closing the Atlantic tunnel, and the agreements thereunder, the defendant, the Long Island Railroad Company, has agreed never to run cars propelled by steam over such route, and that the property was purchased at mortgage foreclosure sale charged with such a prohibition ; and also because, as is claimed, the act of 1876 is unconstitutional:

*Held, first,* that the Long Island Railroad Company has not made any agreement or promise obligating itself not to use steam either upon Atlantic avenue or elsewhere.

*Second.* As the decree in the foreclosure suit provided that the sale was subject to the provisions of the agreement between the two companies, and as such agreement only obligated the Brooklyn and Jamaica Railroad Company to the Long Island Railroad Company not to use steam cars upon the avenue, which agreement was for its own benefit, and as it had not bound itself to any one in the same direction, it follows that when the Long Island Railroad Company acquired title to the roadway there was no prohibition as to them preventing a legislative license for the use of steam power thereon. The Long Island Railroad Company cannot be bound by the provision in the mortgage foreclosure decree, because the contract was to and with it, and not by it.

*Third.* As to the other exceptions and reservations contained in the decree of foreclosure — relating to the acts under which the tunnel was closed — nothing therein contained prevented these defendants, or either

of them, from acquiring a future right to use steam upon the avenue. The surrender of a right existing by its owner is no covenant against a future acquirement thereof, any more than a sale of present interest in any property or business is an agreement against a future repurchase.

*Fourth.* That no contract whatever existed by force of the act of 1859 preventing the state in the future from conferring the right to use steam on Atlantic avenue, Brooklyn, upon the defendants. Nor can one legislature by a law deprive a succeeding one, in a matter of public policy, from changing or altering the enactment.

*Fifth.* That no agreement has been made either with the people, the city of Brooklyn or the owners of the property in the district taxed under the act of 1859, which will justify the maintenance of this action.

*Sixth.* That a railroad corporation cannot, by contract, when no statute authorizes it so to do, bind itself to a particular mode of propelling power, regardless of the interests of the people, which may require it to adopt a different one.

*Seventh.* The statute (*Laws of* 1876, *chap.* 187) under which the defendants claim the right to use steam upon the avenue, is not obnoxious to section 1 of article 14 of the Constitution of the United States, declaring, among other things, that no state can "deprive any *person* of life, liberty or *property* without due process of law," nor to section 6 of article 1 of the Constitution of this state, which likewise provides that "no *person* shall     *     *     *     be deprived of life, liberty or *property* without due process of law."

*Eighth.* That when, as against the owners of the land, the right to operate a railroad has been acquired, the mode of such use, whether by steam or otherwise, is a matter within legislative control, and in regulating such use, no right of property is infringed upon, to which the above cited provisions from the federal and state Constitutions are applicable.

*Ninth.* That the act (*Laws of* 1876, *chap.* 187) is not unconstitutional under section 18 of article 3 of the Constitution, which prohibits the legislature from passing "a private or local bill     *     *     *     granting to any corporation, association or individual the right to lay down railroad tracks;" or "granting to any private corporation, association or individual any exclusive privilege, immunity or franchise whatever."

The act of 1876 confers "no right to lay down railroad tracks." The privilege so to do was one already enjoyed by both defendants as already existing railroad corporations. The act gave legislative permission to use steam as a motive power on railroad tracks already constructed, the right to relay and repair which was an incident to the original grant. Such a legislative permission to an existing corporation is not covered by the above constitutional provision.

Nor do the defendants obtain under the law an "exclusive privilege" or "franchise." The prohibition is to a grant which *in words* is exclusive. It may be true that conferring upon A. authority to do an act, may practically prohibit B. from doing the same thing, because the latter may be unwilling to compete with the former; but so long as B. is left free to act, and nothing has been done which, if valid, would enable A. to enjoin B., because he (A.) has an exclusive right, the provision in the Constitution is not violated.

*Tenth.* That if there is a defect in the title to any of the land occupied by the defendants, such defect does not justify this action, but each owner of the land wrongfully held must seek his remedy by suit brought in his own name.

*Albany Circuit and Special Term, June,* 1880.

*Simon Sterne* and *Samuel Hand,* for plaintiff.

*E. B. Hinsdale* and *B. F. Tracy,* for defendants.

WESTBROOK, *J.* — The relief asked in this action is to perpetually enjoin the defendants from using Atlantic avenue, in Brooklyn, for the purposes of a steam railway, and the cause is brought to a hearing upon pleadings and proofs, a part of the evidence having been taken in court and a part before a referee. Such pleadings and proofs are contained in two printed volumes, the one of 902 pages and the other of 637 pages; and if a decision has been somewhat delayed, counsel will remember that the cause was submitted for their accommodation during a recess of court, with the explanation of an accumulation of older cases which would be disposed of before this could be considered.

The Long Island Railroad Company was incorporated April 24, 1834 (*chapter* 178, *Laws of* 1834); and by virtue of an act of the legislature of this state, passed April 2, 1836 (*chapter* 94 *of Laws of* 1836), it, on the 1st day of December, 1836, leased a road belonging to the Brooklyn and Jamaica Railroad Company, a corporation formed under chapter 256 of the Laws of 1834.

Upon the consideration of this case, it will be assumed that, until the consummation of the proceedings had under and in pursuance of chapter 484 of the Laws of 1859, the Brooklyn and Jamaica Railroad, and its lessee, the Long Island Railroad Company, had a right to operate a railroad by steam over and upon lands, the principal part of which is now Atlantic avenue, in the city of Brooklyn. This has been so held in two cases, the one in the circuit court of the United States for the eastern district of New York (*Miller* agt. *The Long Island Railroad Company*), decided by judge BLATCHFORD, and the other in this court (*Barnes* agt. *The Atlantic Avenue Railroad Company of Brooklyn, and The Long Island Railroad Company*), decided by judge GILBERT ; and as early as the year 1850 the right of the defendant, the Long Island Railroad Company, to occupy a part of Atlantic avenue for railway purposes was affirmed (*Plant* agt. *Long Island Railroad Company*, 10 *Barb.*, 26 ; see, also, *Dunham* agt. *Williams*, 37 *N. Y.*, 51, *and especially page* 254). The road had, prior to such act, been so used for many years, and if any technical defect exists in the title of any part of the railway bed or property occupied by them, the right of the true owner or owners thereof, if not lost by lapse of time, must be enforced by them as individuals, and such defect of title furnishes no ground for the maintenance of this action by the people, the alleged basis of which is the creation by the defendants of a public nuisance.

When the act of 1859 was passed the defendant, "The Long Island Railroad Company," reached the East river by a tunnel under the surface of Atlantic avenue. The act of 1859, to which reference has just been made, was entitled (*chapter* 484, *Laws of* 1859) "An act to provide for the closing of the entrances of the tunnel of the Long Island Railroad Company in the city of Brooklyn, and restoring said street to its proper grade, and for the relinquishment by said company of its right to use steam power within said city." The method of accomplishing the objects set forth in the title

of the law was as follows : A territory, the property in which was to be assessed to accomplish its purposes, was defined. The common council of the city of Brooklyn, on the petition of a majority of the owners of the land in such district, were required to apply to the supreme court for the appointment of three commissioners, whose duty it was declared to be " to enter into a contract, in writing, with the Long Island Railroad Company, or its assigns, that they shall close the entrances of the·tunnel in Atlantic street in the city of Brooklyn, and restore and regulate the same to the proper grade, and also for the relinquishment by said company and its assigns of the right to use steam power within said city ;" and also obligating the said company or its assigns to construct a surface railroad upon said street, and to run horse cars for the transportation of freight and passengers between the South Ferry at the East river and the city line at East New York, then connecting with steam cars at the times and in the manner as are in the act specified. The Long Island Railroad Company was also to be obligated by the agreement, to be made under the act, to make sundry improvements upon the streets occupied by them, and the commissioners were directed to assess upon the property within the district designated in the law a sum not exceeding $130,000, no more than $125,000 of which was to be paid to " The Long Island Railroad Company or its assigns    *    *    as compensation for the compliance with such contract, and the surrender of the right of said company, and the Brooklyn and Jamaica Railroad Company to use steam within the city limits," and a sum not exceeding $5,000 " to cover all the expenses of collecting the same and executing this commission."

The provisions of this act were substantially carried out. The Long Island Railroad Company surrendered its lease to the Brooklyn and Jamaica Railroad company, and also all its rights in and to the tunnel, and to the compensation provided for by the law, and the Brooklyn and·Jamaica Railroad Company on its part agreed with the Long Island Railroad that

"the use of steam power shall cease upon the present or any future track of the Brooklyn and Jamaica Railroad Company, its successors or assigns, or any persons or corporations claiming under it, or using its tracks or lands, within the limits of said city; and that no steam-engine or locomotive shall be at any time hereafter used, or suffered or permitted by the Brooklyn and Jamaica Railroad Company within the said city limits, or by its successors or assigns, or any persons or corporations claiming under them; and that the said Brooklyn and Jamaica Railroad Company, its successors and assigns, shall and will insert in any conveyance, grant or demise of their said road or franchises, a covenant to the same effect by the grantee, in such form that it shall enure to the benefit of the Long Island Railroad Company, its successors or assigns; and it is expressly understood that the said Long Island Railroad Company shall, in case of any attempt to use steam, in violation of the agreements herein contained, be entitled in its own name to have an injunction against its use, and to have the covenants of the Brooklyn and Jamaica Railroad Company herein contained specifically enforced."

The agreement of the commissioners appointed under the act of 1859, providing for the closing of the tunnel and the surrender of the right to use steam upon the avenue, was with the Brooklyn and Jamaica Railroad Company, who are styled therein "the assignees of the Long Island Railroad Company, within the true meaning and intent of both the said acts," to wit, the said act of 1859, and another relating to the same subject, passed March 23, 1860. The contract required the tunnel to be closed, and the various things done which the law of 1859 enjoined, and the Brooklyn and Jamaica Railroad Company relinquished "its right to use steam within the corporation limits of the city of Brooklyn," and agreed that "steam power shall not be used or permitted upon its road, or any part thereof, within the limits of the city of Brooklyn," after the happening of an event specified in the agreement. The consideration paid to the Brooklyn

and Jamaica Railroad Company for the surrender of its rights was the assignment to it of the assessment upon the property made upon the district designated in the act of 1859, from which it was to receive $125,000. To this contract the Long Island Railroad Company assented, "so far as it has any right so to do, and so far as it has any interest therein," by the insertion of a clause to that effect in the agreement between the Brooklyn and Jamaica Railroad Company and such commissioners, and by signing said agreement through its then president, William E. Morris.

On April 5, 1855, the Brooklyn and Jamaica Railroad Company executed to Samuel Willetts, Robert Ray and Alexander Hamilton, Jr., as trustees, a mortgage to secure its bonds to the amount of $100,000. This mortgage covered all its property, including that leased to the Long Island Railroad Company. A suit to foreclose this mortgage was instituted in this court, to which the Long Island Railroad Company was a party, and served an answer, in which was set out the surrender of its lease to the Brooklyn and Jamaica Railroad, and the various contracts and agreements made under the aforesaid act of 1859, and which have been hereinbefore detailed.

On the 21st day of March, 1872, a decree of sale in the foreclosure action was made, such sale to be "subject to a certain agreement or release made between the Brooklyn and Jamaica Railroad and the Long Island company, dated April, 1860" (it being the same agreement the provisions of which have been recited in this opinion), "and subject also to the provisions of an act of the legislature of the state of New York, passed April 19, 1859, entitled" (the title is given in full), "and subject, also, to the provisions of a certain other act of said legislature, passed April 16, 1860, entitled 'An act authorizing the Brooklyn Central and the Brooklyn and Jamaica Railroad Companies to consolidate,' and continue their roads so far as such provisions of said acts relate to the closing of the tunnel in Atlantic street, in the city of Brooklyn, and the relinquishment of steam power within the limits

of said city, which acts are referred to in the answer of said defendant, the Long Island Railroad Company."

Under this decree of foreclosure the property of the Brooklyn and Jamaica Railroad was sold on the 28th day of September, 1872, and at such sale one William Richardson became the purchaser, the property being bought subject to the condition contained in the decree.

On the 29th day of April, 1872, in pursuance of the act entitled "An act to authorize the formation of railroad corporations, and to regulate the same," passed April 2, 1850, a railroad corporation was formed under the name of "The Atlantic Avenue Railroad Company of Brooklyn." To this corporation, on the 28th day of February, 1874, William Richardson, the purchaser at the foreclosure sale, conveyed the property bought thereat, and which, in the deed is described as "all and singular the railroad of the Brooklyn and Jamaica Railroad Company, extending from its commencement at the ferry at the foot of Atlantic street, in the city of Brooklyn, in Kings county, to its termination in the village and town of Jamaica, in the county of Queens, including all its appendages, and the depot lots in the village of Bedford, and the right to construct branches to Flushing or Flatbush, as secured to the said The Brooklyn and Jamaica Railroad Company by their act of incorporation."

On the 26th of March, 1877, the Atlantic Avenue Railroad Company leased to the Long Island Railroad Company "its successors and assigns, all the railroad of the party of the first part, extending from its eastern terminus in the village of Jamaica, westward to the city line of the city of Brooklyn, in Atlantic avenue, and thence along said avenue to a point in Atlantic avenue, in the city of Brooklyn, two hundred and fifty feet east of the easterly line of Flatbush avenue, said two hundred and fifty feet to be measured along a line in the centre of Atlantic avenue," and also sundry other property as is in the lease specially provided.

By chapter 187 of the Laws of 1876, it was declared, "It

shall be lawful for the Atlantic Avenue Railroad Company of Brooklyn, and for the Long Island Railroad Company, as lessee from the Atlantic Avenue Railroad Company of Brooklyn of that part of the railroad of said Atlantic Avenue Railroad Company which extends from the junction of Atlantic and Flatbush avenues, in the city of Brooklyn, eastwardly along said Atlantic avenue to the city line, to run cars over said railroad, upon Atlantic avenue, from the city line of Brooklyn to Flatbush avenue, by steam power, subject to such rules and regulations as to rate of speed and public safety as, from time to time, the common council of the city of Brooklyn may prescribe."

Under this law, and in conformity therewith, and with the regulations of the common council of the city of Brooklyn, the defendants were, when this suit was commenced, adapting and changing the horse railroad track to that of a steam railway, and are now propelling cars thereover by steam. Against this the plaintiffs ask an injunction, because, as they allege, by the acts closing the Atlantic avenue tunnel, and the agreements thereunder, the defendant, The Long Island Railroad Company, has agreed never to run cars propelled by steam over such route, and that the property was purchased at mortgage foreclosure sale, charged with such a prohibition; and also because, as is claimed, the act of 1876 is unconstitutional. These points will now be considered.

As to the alleged agreement by the Long Island Railroad Company not to use steam for moving cars upon Atlantic avenue, I feel constrained to say, though the contrary was strongly asserted upon the argument, that I have failed to find any covenant by it to that effect. It is true that when the act of 1859 became a law, it was drawing cars by steam power upon such avenue, but this was under a lease it held from the Brooklyn and Jamaica Railroad Company. To enable the last named company to avail itself of the provisions of that act, and for other considerations in the agreement between the two companies specified, it surrendered to that

company its lease and property upon the avenue, and obligated that company (the Brooklyn and Jamaica), its successors and assigns to it (the Long Island Railroad Company), and to no other party or parties, not only to refrain from the use of steam cars upon Atlantic avenue, but anywhere " within the limits of said city," but it has not made any agreement or promise obligating itself not to use steam either upon Atlantic avenue or elsewhere. Unless then, in the voluminous papers submitted to me, some agreement to that effect has been overlooked, this action against these defendants must fail, so far as it may depend for success upon any contract by the defendants, or either of them, not to do that which the plaintiffs seek to enjoin.

· In the statement just made — that the Long Island Railroad Company has not agreed that it would never use steam as a motive power for cars upon Atlantic avenue, but that the Brooklyn and Jamaica Railroad Company has so obligated itself " for the benefit of the Long Island Railroad Company "— will be found the answer to the argument founded upon the fact that the Long Island Railroad Company now holds the property charged with the conditions impressed upon it by the decree of foreclosure against the Brooklyn and Jamaica Railroad Company, subject to which Mr. Richardson made his purchase, and under which purchase, by virtue of his deed to the Atlantic Avenue Railroad Company, and the lease of the latter to it, the Long Island Railroad Company enjoys its alleged rights. As the decree provided that the sale was subject to the provisions of the agreement between the two companies, and as such agreement only obligated the Brooklyn and Jamaica Railroad Company to the Long Island Railroad Company not to use steam cars upon the avenue, which agreement was for its own benefit, and as it had not bound itself to anyone in the same direction, it follows that when the Long Island Railroad Company acquired title to the roadway there was no prohibition as to them preventing a legislative license for the use of steam power thereon. Pos-

sibly the original purchaser, Mr. Richardson, or his immediate assignee, the Atlantic Avenue Railroad Company, might have been bound by the provision in the mortgage foreclosure decree, but the Long Island Railroad Company cannot be, because the contract was to and with it, and not by it. As to the other exceptions and reservations contained in the decree of fore-closure — relating to the acts under which the tunnel was closed — it will presently be seen, that nothing therein con-tained prevented these defendants, or either of them, from acquiring a future right to use steam upon the avenue.

Let us now examine the argument, which seeks to deduce from the act of 1859, an agreement between the State and the owners of the property assessed, to the effect that the use of steam should be forever prohibited upon the avenue.

There is certainly nothing in the law indicating an agree-ment on the part of any person. There is no voluntary pay-ment to be made for the surrender of existing rights, nor for an agreement as to future conduct. The act simply provides for the raising of $130,000 upon a district, which is defined, for the purpose, among other things, of procuring " a contract in writing with the Long Island Railroad Company, or its assigns, that they shall close the entrances of the tunnel in Atlantic street, in the city of Brooklyn, and restore and pave and regulate the same to its proper grade, and also for the relinquishment by said company and its assigns of the right to use steam power within said city." Instead of the payment being voluntary by the owners of the property within the district, we know from the history of litigation in this state, as contained in the reports, that payment of the assessments under the law was resisted; and their legality was sustained upon the ground that it was the exercise of the taxing power of the state (*Litchfield* agt. *Vernon, and People ex rel. Crowell* agt. *Lawrence and others, Commissioners*, 41 *N. Y.*, 123 ; *Litchfield* agt. *McComber*, 42 *Barbour*, 288). The extract above given from the act shows for what purpose the assess-ment was made, and the money paid. No agreement was.

required to be exacted from the Long Island Railroad Company or its assigns, in regard to the future use of steam, but only one requiring the closing of the entrances to the tunnel, the restoration of the street and the "relinquishment * * * of the right to use steam power within said city." Bearing in mind that the right to use steam then existed, the language is easily understood. The surrender of a right existing by its owner is no covenant against a future reacquirement thereof, any more than a sale of present interest in any property or business, is an agreement against a future repurchase. Perhaps the owners of the property on Atlantic avenue, who were instrumental in obtaining the legislation and the consummation of the proceedings authorized by law, expected that steam would not thereafter ever be used thereon as a propelling power, but whatever their expectation in that regard was, it is certain that they have failed to insert any such prohibition in the statute. But even though it had been embodied in the act, it would have been ineffectual to control a subsequent legislature. It is beyond the power of the law-making authority of a state to control future legislation upon matters of public interest. Such a doctrine, if sustained by the courts, would bar all progress, and restrain growth and prosperity by legal barriers, which would be unendurable. It is unnecessary, however, to reason either upon the effect of the language in the act of 1859, or its validity, if it could be construed as claimed by the counsel for the plaintiffs. The case of *Newton and others* agt. *Commissioners of Mahoning* (vol. 21, *Albany Law Journal*, page 350 — date of publication of journal, May 1, 1880, and now reported in 10*th Otto*, 548), decided by the supreme court of the United States, settles every question thereunder. It was sought in that action to restrain the removal of the county seat of Mahoning county, Ohio, from Canfield to Youngstown. The location had been made at the former place by an act of the legislature of that state passed in 1846, which declared it should be "permanently established" there upon the fulfill-

ment of certain prescribed terms and conditions, which were fully complied with. After the county seat had remained at Canfield for about thirty years, in 1874 another act was passed removing it to Youngstown. It was held by the court, Mr. justice SWAYNE writing the opinion, " (1.) That the contract clause of the Constitution had no application. (2.) That the act of 1846 was *a public law* relating to *a public subject*, with respect to which a prior had no power to bind a subsequent legislature. (3.) Conceding there was a contract as claimed, it was satisfied on the part of the state by establishing the county seat at Canfield, *with the intent* that it should remain there. (4.) There was no stipulation that the county seat should be *kept* or *remain* there in perpetuity. (5.) The rule of interpretation in cases like this, as against the state, is, that nothing is to be taken as conceded, but what is given in express and explicit terms, or by an implication equally clear. Silence is negation, and doubt is fatal to the claim " (*See, also, The People* agt. *Roper*, 35 *N. Y.*, 629).

Upon both reason and authority, then, we are constrained to decide that no contract whatever existed by force of the act of 1859, preventing the state in the future from conferring the right to use steam on Atlantic avenue, Brooklyn, upon the defendants, and it will next be considered whether any actual agreement has been made by any one, either with the general public or property holders, or the city of Brooklyn, that steam power should not be thereafter used to propel cars upon Atlantic avenue.

It has been already said that the Long Island Railroad has made no such covenant, but it is proper to refer to it again in this connection. A reference to its contract with the Brooklyn and Jamaica Railroad Company makes the assertion that such company has not so agreed clear. The former corporation was about to change its eastern terminus from the South Ferry to Hunter's Point, and was desirous, as it surrendered its lease to the latter, to prevent it (the Brooklyn and Jamaica Company) from using steam within the city of Brooklyn, not

only for the benefit of property holders on Atlantic avenue, but " also for the private interests of the Long Island Company connected with its change of location," and it therefore . exacted from the Brooklyn and Jamaica Railroad Company an agreement to itself to abandon forever the right to use steam within the city limits, with an express stipulation that it (the Long Island Railroad Company) should, in case steam was ever so used by the Brooklyn and Jamaica company or its assigns, "be entitled in its own name to have an injunction against its use and to have the covenant of the Brooklyn and Jamaica Railroad Company," in such agreement contained, " specifically enforced."

To the agreement subsequently made between the Brooklyn and Jamaica Railroad Company and the commissioners appointed under the act of 1859, the Long Island Railroad Company was not a party as a covenantor. It (the latter) had surrendered to the former all its rights acquired by the lease, and had obligated it (the Brooklyn and Jamaica Railroad Company) to itself (the Long Island Railroad Company) not to use steam within the city limits, and it simply gave its consent to the Brooklyn and Jamaica company making such covenants as it pleased. The contract is expressly declared to be " between the Brooklyn and Jamaica Railroad Company, party of the first part, and the said Theodore F. King, John L. Lawrence and John Winslow, commissioners,  *  * parties of the second part." The covenants and obligations are only those of the Brooklyn and Jamaica Railroad Company, to which the Long Island Railroad Company assented ( *i. e.*, that the former might bind itself as it chose), because, to use the language of the agreement, it was " thought advisable " that it should " assent " thereto, and it therefore did " so far as it had any right so to do, and so far as it has any interest therein."

· Before proceeding to consider the agreement which was made between the Brooklyn and Jamaica Railroad Company and the commissioners appointed under the act of 1859, it

should be borne in mind that, as that statute prescribed the terms to be exacted thereunder, such contract is valid only to the extent of the power conferred by such law ; and also, that the franchise now claimed by the defendants is not derived from the Brooklyn and Jamaica Railroad, but under a law of the state enacted in 1876. It is not, therefore, very important for the purposes of this case, to consider what obligations that corporation has incurred, but it may not be improper briefly to consider them.

There is, as has been previously argued, a wide difference between the surrender of a franchise, with an agreement not to exercise *it* (that is, *the present right* which is surrendered), and a covenant against an acquisition of a *new right* thereafter. Such a construction of the language of the agreement we are considering is not technical, but the reverse. Corporations are created for the public good, and any contract, which one may have made, abridging its powers, which should ever remain in full force to be exercised for the convenience of the public as it may require, should be construed, if possible, in accordance with the public interests, and not against them. Whether an agreement by a railroad company, which cripples its ability to fill the public needs is valid at all, is a question which will be hereafter discussed. We are now dealing with another, which is, did the Brooklyn and Jamaica Railroad Company, by its agreement with the commissioners, agree never thereafter to acquire a new right or franchise for the use of steam within the city ? The corporation was simply surrendering property and rights it then possessed, and in speaking of such surrender, the language relied upon by the counsel of the plaintiffs is employed. It obligated itself to perform all things required by the act of 1859, and the act of 1860 (*chap.* 100 *of Laws of* 1860), and then, as a time had to be fixed for the termination of the then existing right to use steam within the city, it provided that " steam power shall not be used, or permitted upon its road, or any part thereof within the city of Brooklyn, at any time or times after the

completion of said new road between Jamaica and Hunters Point." A reference to the act of 1860, just spoken of, will show the significance of this language, and .develop its full meaning. That statute provides for the assignment of the assessment, levied under the law of 1859, to the company, with power to it to collect the same, in lieu of the payment to it of the money itself, upon, among other conditions, the company's "agreeing to discontinue the use of steam within the limits of said city upon completion of their new road from Jamaica to Hunters Point." It was in execution of this clause in the law of 1860 that the language in the agreement was used. It provided for the discontinuance of a present franchise only, and any attempt to give it a wider meaning is a straining of the words beyond their natural and, as it seems to me, their plain meaning.

Having reached the conclusion that no agreement has been made either with the people, the city of Brooklyn or the owners of the property in the district taxed under the act of 1859, which will justify the maintenance of this action, it is proper also to state that whilst the existence of such an obligation has been discussed its validity, if made, is not conceded. Very clearly, as has been shown elsewhere, a legislature cannot, in a matter of public policy, bind its successors, and a similar principle applies to corporations created for the public good. Railroad companies are formed to promote the general convenience, and to serve the general interests of communities. The convenience and interests of the general public are shifting and changing, and as a railroad company is under a moral obligation at least, if not a legal one, to serve the public to the extent of its ability, it cannot so hamper itself by an agreement, as to make impossible the fulfillment by it of one of the most important objects of its creation. It is unnecessary to consider whether, if a corporation agrees not to do in the future something which the law will permit, and the general public convenience may then require to be done, and although it has received a consideration for its agreement, it

still does what it agreed it would not do, an action will lie for damages, or to recover the consideration paid, as that point is not involved in this action. The precise question is, can a railroad corporation, by contract, when no statute authorizes it so to do, bind itself to a particular mode of propelling power, regardless of the interests of the people, which may require it to adopt a different one ? If it can, then progress may be checked, and if such a principle had in adoption been coeval with the invention of the railroad, a continent might not now be spanned, and all the· dwellers of a country greater in extent than any on earth, might not then have been, as they now are, neighbors, by means of those roadways of iron and steel, the distance over which steam has so lessened. It is apparently easy to point out cases of individual hardship by the proximity of a railroad to a dwelling or place of business. Such instances may be found in the open country, as well as in the densely populated metropolis, but arguments based thereon, generally more plausible than sound, cannot establish a principle, which will enable the opposers of right progress to force by contract upon an infant enterprise barriers thereto, from which escape shall be impossible, and the attempted fulfillment of what may be the highest needs of its creation useless.

The remaining questions in the cause are upon the validity of the law (*chap.* 187 *of Laws of* 1876) under which the defendants claim the right to use steam upon the avenue, the language of which has been hereinbefore given. To that act various objections founded upon constitutional provisions are made, which will now be considered :

*First.* It is contended that such statute is obnoxious to section 1 of article 14 of the Constitution of the United States, declaring, among other things, that no state can " deprive any *person* of life, liberty or *property* without due process of law," and also to section 6 of· article 1 of the Constitution of this state, which likewise provides that " no *person*

shall * * * be deprived of life, liberty or *property* without due process of law."

To this objection it may be answered, that assuming it to be true that some "person" has, under the color of that act, had *his* "property" taken, how does that fact justify this suit by the people ? If any individual is unlawfully deprived of his property by another, the remedy is by an action in his own behalf ; and when the separate property of several different individuals has been taken wrongfully, by either a natural or an artificial being, each one must seek redress for his own wrong by his own suit. There is no rule of law or practice which enables different parties, whose several and separate properties have been taken, to bring one action in the name of the people, in which one suit, their several and distinct rights depending, perhaps, upon evidence and principles which are unlike, may be all settled and adjusted. We are entirely unable then, to discover how the provisions of either the federal or state Constitution can be successfully invoked to aid this action, if the fact was that property of individuals would be taken thereunder without compensation. But the act was neither intended to, nor does it accomplish such a purpose. It was designed to confer a privilege, without which, perhaps, the use of steam might have been unlawful. The people, having by an express law conferred the right to use steam upon the avenue, cannot, in an action in which they are plaintiffs, claim in their own behalf that what they have authorized is a public nuisance (*Harris* agt. *Thompson*, 9 *Barbour*, 350 ; *see opinion of* HAND, J., *on pages* 363, 364, 365, 366).

It is also urged, however, that the general public has, if the law is valid, lost the right to use the whole of Atlantic avenue as a street, as it existed at the time the act of 1876 was passed, and that such right of use constituted a property in the public, of which it is deprived without compensation, and for that reason such law is unconstitutional. That argument is equally unsound. The constitutional provisions do not reach public

The People agt. Long Island Railroad Company.

rights or public property. They were designed to protect individuals and not the state. It is a "*person*" who cannot be deprived " of  *  *  *  property without due process of law." Whenever all individual ownership of, or title in property has been extinguished, and its right for use by the general public acquired, there is no contract express or implied with any one, that the mode of use which was first adopted shall always continue to the exclusion of any other. If, for example, the fee of the land used for a street has become vested in a municipality for public uses, the legislature can regulate such use, and permit the enjoyment thereon of new and other modes of transit in addition to those first adopted (*People* agt. *Kerr*, 27 *N. Y.*, 188; *see pages* 192, 194, 195, 204; *Killinger* agt. *Forty-second street R. R. Co.*, 50 *N. Y.*, 206). And when property has been acquired for public use, there is no obligation to hold it for such a purpose, and it can by legislative permission be sold to private parties, "notwithstanding the fact that such abandonment and sale will lessen the value of surrounding property, which has been assessed for the benefit and advantage to it from the maintenance of such use. There is no contract in such cases with the owner of such adjacent property to maintain the use" (*The Brooklyn Park Commissioners* agt. *Armstrong*, 45 *N. Y.*, 234). These principles in no wise infringe upon that on which *Wager* agt. *Troy Union Railroad Company* (25 *N. Y.*, 526), was decided. It is not now held, that an easement acquired for the purposes of an ordinary highway will justify a railroad company in the occupation of such highway for railroad purposes, without compensation to the owners of the land. If any such cause of action, however, exists in any one's favor, he must enforce it for himself. The right, as against the original owners of the soil, to use Atlantic avenue for a railroad has, for the purposes of this action, been assumed, because if it does not exist, the remedy is not by this suit, and also because such right has been expressly adjudged to have been acquired (see cases cited in beginning of opinion); and a user under a claim thereof

has been enjoyed so many years anterior to this action, that its discussion in a suit, which cannot remedy the alleged wrong, would be unprofitable. What is claimed is, that when as against the owners of the land, the right to operate a railroad has been acquired, the mode of such use, whether by steam or otherwise, is a matter within legislative control, and in regulating such use, no right of property is infringed upon, to which the above cited provisions from the federal and our state Constitutions are applicable.

It was also earnestly argued by the counsel of the plaintiffs that, by the action had under the act of 1859 and " the payment of the $130,000, the public acquired the franchise for the public use that the railway companies theretofore had," and that now the public has an interest therein which the state cannot confer " upon these private corporations." Who the " public " are, which " acquire the franchise for the public use," we are not informed. If the city of Brooklyn was the acquirer, or a number of individuals so great that they can be called " the public," are the persons so styled, and are the successors to those rights, then it or they should enforce them. If the whole people are thereby intended, it is reasonably safe to say that the state can, through its legislature, bestow its property as it deems best for the public good, unless restrained by the fundamental law. The difficulty with the argument, however, is that there has been no *purchase or transfer* of a right at all, but simply the *extinguishment or surrender* of one. There was, as has been hereinbefore shown, no covenant nor agreement as to the future. If that was intended, such intention has never been expressed in a statute, nor embodied in any agreement, of which the plaintiffs or those for whose benefit this action is brought can avail themselves.

*Second.* But it is urged that the act is unconstitutional under section 18 of article 3 of the Constitution, which prohibits the legislature from passing " a private or local bill * * * granting to any corporation, association or individual the right to lay down railroad tracks;" or " granting to

any private corporation, association or individual any exclusive privilege, immunity or franchise whatever."

To the objection based upon the former of these two prohibitions, it is answered : That the act of 1876 confers no " right to lay down railroad tracks." The privilege so to do was one already enjoyed by both defendants as already existing railroad corporations. The act simply gave legislative permission to use steam as a motive power on railroad tracks already constructed, the right to relay and repair which was an incident to the original grant. Very clearly, such a legislative permission to an existing corporation is not covered by the constitutional provision referred to (*Matter of P. P. and C. I. R. R. Co.*, 67 *N. Y.*, 371). In *Hulburt* agt. *Banks* (52 *How.*, 196) I had occasion to consider the same article of the Constitution, which was then invoked to enjoin the improvement of a part of an existing highway as an entrance or approach to a public park in the city of Albany, upon the ground, among others, that the law under which it was proposed to be done was one " laying out, opening, altering, working or discontinuing roads, highways or alleys," and therefore unconstitutional. The objection was overruled, and the conclusions then reached by me were sustained in the court of appeals (*People ex rel. Commissioners* agt. *Banks*, 67 *N. Y.*, 568). Undoubtedly the language of that part of the Constitution, taking it in its literal sense, can be so construed as to prevent much useful legislation which it was not designed to reach ; but it is, it seems to me, unsound reasoning to hold that the act of 1876 grants " the right to lay down railroad tracks," because the use of steam power made a firmer and stronger track necessary. That law did not confer any such right. Its existing franchise did not require a roadway upon which steam could not be used. The right to substitute heavy for light rails, a strong and compact road-bed for one of lesser strength, was an incident of its previously acquired rights — a privilege it already had, though perhaps it would never have been exercised unless the act had been passed to

avail itself of which the previously unused right was called into action. What the defendants were doing when this action was commenced (strengthening their existing road-bed and rails) was not done because authorized by the law of 1876, but because such statute had made the change necessary if the privilege to use steam, thereby conferred, was to be enjoyed. It may be true that an act rendered necessary to be done by legislation, is one permitted; but when the right so to do exists, and legislation renders its exercise necessary, it cannot be argued that an original grant of power to do such act was by such subsequent legislation conferred.

*The Matter of Brooklyn, Winfield and Newtown Railroad Company* (75 *N. Y.*, 335) has no application. The court held in that case, where a corporation had ceased to exist by lapse of time, that a statute which gave it new life under the pretense of enlarging the time for the performance of certain things which had been originally required, and by reason of not doing which it had forfeited its existence, was void, because, literally, it was by such act attempted to confer " the right to lay down railroad tracks." But neither that nor any decision to which my attention has been directed holds that some privilege may not, by a special act, be conferred upon a living corporate being, and so narrows legislative action, by a literal interpretation of the words of the Constitution as to make impossible relief which cannot be provided for by general laws, and against which the constitutional prohibition was not aimed.

The " exclusive privilege " or " franchise " which it is alleged the defendants obtain under the law, is not, by me at least, perceivable. The prohibition is to a grant which, *in words*, is exclusive. It may be true that conferring upon A. authority to do an act may practically prohibit B. from doing the same thing, because the latter may be unwilling to compete with the former; but so long as B. is left free to act, and nothing has been done which, if valid, would enable A. to

enjoin B. because he (A.) has an exclusive right, the provision in the Constitution is not violated.

In conclusion it is proper to say, that if every argument used in behalf of the plaintiffs has not been discussed, that I see no principle whatever on which this action can be sustained. The defendants own a railroad franchise which they are enjoying in a way authorized by the public law of the state. If they are trespassers upon private property, they may be prosecuted by those who are injured. A minute and somewhat protracted examination and discussion of every point urged by the plaintiffs (though possibly some one in a printed brief of 100 pages may have been overlooked) leads me to the same conclusion which other judges (BLATCHFORD, GILBERT, NELSON and OSBORN) have reached, and that is, that not one is tenable. The defendants are, therefore, entitled to judgment, with costs.