Fuld, J.
 

 In 1954 the Long Island Bail Boad Company qualified as a railroad redevelopment corporation under the newly revised article 7 of the Bailroad Law (known as the Bailroad Bedevelopment Corporations Law). The question presented for decision is whether that qualification created a contract with the State so as to render later amendment of the statute unconstitutional as an impairment of contract obligation.
 

 In 1949 the Long Island filed a petition for reorganization under section 77 of the Federal Bankruptcy Act (IT. S. Code, tit. 11, § 205). The Pennsylvania Bailroad Company was its sole stockholder and its principal creditor. Concern for continued and improved rail service in the area served by the Long Island was shared by the State as well as by the communities affected. Among the many manifestations of this concern was the passage in 1951 of article 7 of the Bailroad Law (L. 1951, ch. 359), providing for the formation of railroad redevelopment corporations, with accompanying changes in the Public Service Law and the Tax Law for the benefit of such corporations. At the same time, the Public Authorities Law was amended (§§ 1701-1726, added by L. 1951, ch. 361) to provide for a new public body, to be called the Long Island Transit Authority, whose purpose was to develop an effective plan for the railroad’s rehabilitation and its operation in a safe
 
 *508
 
 and adequate manner as a private enterprise (§ 1704). If the Authority found that it was unable to accomplish this, it could, by filing an appropriate certificate, have the power necessary to acquire and operate the road itself (§ 1706).
 

 The Authority thereupon entered into extensive negotiations with the Long Island and the Pennsylvania. In 1954 it reported to the Governor that it had succeeded in its task and submitted a plan for the rehabilitation of the Long Island. The final result of the negotiations and the plan was the adoption by the Legislature in June of 1954 of a new article 7 of the Railroad Law (L. 1954, ch. 824, §§ 300-313). In general, the statute followed the pattern and provisions of the plan to which we have referred. Section 300 declared it the policy of the State to rehabilitate railroads involved in bankruptcy proceedings through private enterprise and, to that end, to
 
 “
 
 create, with adequate safeguards, inducements and opportunities for the employment of private investment in such rehabilitation and continued operation ”, including the
 
 “
 
 granting of partial tax exemption to such corporations ”. Any railroad corporation desiring to qualify as a redevelopment corporation was to have its charter amended accordingly and, in addition, was required to obtain a certificate of approval from the Public Service Commission, in which its financing program was to be set forth (§ 303). Its new status was to endure for 12 years unless it chose to discontinue it after three years (§§ 301, 311). As a redevelopment corporation, it was granted partial tax exemption (§ 305) and given the power to maintain rates and fares to afford it “ sufficient operating revenues ” over a 12-month period to meet its expenses, including the cost of the redevelopment program (§ 306).
 

 Section 307 provided that, should the railroad’s revenues be insufficient, the company would be entitled to raise its fares — to become effective ten days after delivery of its tariff schedules to the Public Service Commission for filing — subject only to subsequent review by the commission to determine whether the new fares were needed to provide the required revenues.
 

 Following enactment of the law, the Long Island, as contemplated, moved for and obtained a discontinuance of the bankruptcy proceedings in the United States District Court. Then, in August of 1954, it became a railroad redevelopment corpora
 
 *509
 
 tion and filed its certificate of approval from the Public Service Commission, showing that it was to obtain loans from the Pennsylvania and from private investors sufficient to enable it to purchase new cars and locomotives and to provide it with working cash in the amount of $2,500,000. In addition, the Pennsylvania was to forbear, over the 12-year period specified, from collecting dividends or interest on the Long Island’s existing indebtedness to it.
 

 The fares specified in the certificate of approval as ‘
 
 [1]
 
 reasonably required * * * in order to enable it [the Long Island] to have sufficient operating revenues ” proved insufficient, although they were
 
 20%
 
 higher than those previously in effect. Two further fare increases followed—which the Public Service Commission did not disturb.
 

 When a third increase was announced in 1958, the G-overnor sent a message to the Legislature condemning the provision which sanctioned fare increases prior to approval by the Public Service Commission as contravening “ the * * * customary procedure for railroad and other utility rate increases.” He recommended approval of a bill, which had been introduced, to restore the customary practice, and that bill—amending section 307 of the Railroad Law—was enacted into law (L. 1958, ch. 386). Although the new law does not change the 1954 formula as to the quantum of revenues which the railroad was entitled to receive, it requires that prior application must be made for approval of rates designed to produce these revenues. Since then, we are informed, there have been three further rate increases, approved as required by the commission. Two of them took effect on the dates specified in the company’s applications ; the third took effect a month after such date, resulting, according to the plaintiffs, in a loss of revenue of some $300,000.
 
 [1]
 

 The present action was commenced in December, 1958. In their complaint, the Long Island and the Pennsylvania recount, in considerable detail, the steps which led up to the former’s qualification as a railroad redevelopment corporation, and the
 
 *510
 
 subsequent performance by both plaintiffs of the matters set forth in the certificate of approval, reciting that such qualification and performance were pursuant to the plan set forth in the Authority’s report to the Governor in 1954. The complaint then alleges the change made in section 307 of the Railroad Law by the 1958 statute and prays for a declaratory judgment that the original grant of power to the Long Island (by § 307) to increase its fares and charges without advance approval by the Public Service Commission
 
 ‘ ‘
 
 constitutes one of the provisions of a contract entered into in 1954 ’ ’ between the plaintiffs and the State and that the 1958 amendment, ‘ ‘ as and if applied to the Long Island, impairs the obligation of such contract ”, in violation of both the Federal and State Constitutions (U. S. Const., art. I, § 10; N. Y. Const., art. I, § 15).
 

 The court at Special Term granted declaratory judgment in favor of the defendant, holding that the State did not enter into a contract with the Long Island in 1954 but simply adopted a general incorporation act which could be altered without impinging on any constitutional provision. The plaintiffs appealed directly to this court in asserted reliance on subdivision 4 of section 588 of the Civil Practice Act, but we dismissed the appeal because a nonconstitutional question was involved (9 N Y 2d 909). The plaintiffs thereupon appealed to the Appellate Division from the judgment entered at Special Term and, from its affirmance by a divided court, they appeal to us as of right. The nonconstitutional question, relating to the existence of a contract, which dictated dismissal of the earlier appeal is now properly before us. Our study establishes that the courts below were correct in holding that neither the 1954 legislation nor the plan leading up to it constituted or gave rise to a contract between the State and the plaintiffs.
 

 We assume, for the purposes of this case, that there is no form prescribed for the kind of contract which the plaintiffs nlaim they made with the State. We look in vain, however, in the mass of material presented, either for a statement of the terms of the alleged contract or a manifestation by the State of an intention to be bound by the provisions of an agreement. The plaintiffs evidently share our difficulty, for nowhere in their complaint do they allege the making of a contract or its terms.
 
 *511
 
 Indeed, the only reference to contract is found in the passage quoted above from the prayer for relief, wherein the plaintiffs ask the court to declare that section 307 of the Railroad Law “ constitutes ” a provision of a contract.
 
 [2]
 
 This is tantamount to asking the courts to create a contract rather than to enforce one previously made.
 

 If, then, there is a contract in this case, it must be found in the legislation which was enacted. As bearing on this, it is settled that, before a law may be deemed to amount to a contract between the State and a third party, the statutory language must be examined and found to be “plain and susceptible of no other reasonable construction ’ ’ than that a contract was intended.
 
 (Stanislaus County
 
 v.
 
 San Joaquin C. &
 
 I.
 
 Co.,
 
 192 U. S. 201, 208; see, also,
 
 Grand Hall Lodge Assn.
 
 v.
 
 Moore,
 
 224 Ind. 575, 579, affd. 330 U. S. 808.) “ It is never to be assumed, ’ ’ this court has said, ‘ ‘ that the State has * * * fettered its power in the future, except upon clear and irresistible evidence that the engagement was in the nature of a private contract, as distinguished from a mere act of general legislation; and that such, in the particular instance, was the actual and deliberate intention of the State authorities. ’ ’
 
 (People
 
 v.
 
 Roper,
 
 35 N. Y. 629, 633; see, also,
 
 Salt Co.
 
 v.
 
 East Saginaw,
 
 80 U. S. 373, 379;
 
 People ex rel. Gallatin Nat. Bank
 
 v.
 
 Commissioners,
 
 67 N. Y. 516, 519.) In the case of a general law, such as one fixing rates or tax exemptions or salaries of officials, the presumption is that it “is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise,” and he who
 
 *512
 
 asserts the existence of a contract ‘ ‘ has the harden of overcoming the presumption.”
 
 (Dodge
 
 v.
 
 Board of Educ.,
 
 302 U. S. 74, 79; see, also,
 
 Lapolla
 
 v.
 
 Board of Educ. of City of N. Y.,
 
 172 Misc. 364, 366, affd. 258 App. Div. 781, affd. 282 N. Y. 674.)
 

 There is, of course, a distinction between a special legislative act granting a right to a particular specified party and a statute affording ‘ ‘ general encouragement to all persons to engage in a certain class of enterprise ”.
 
 (Wisconsin & Michigan Ry. Co.
 
 v.
 
 Powers,
 
 191 U. S. 379, 385.) The distinction is plainly delineated, and the reason for it clearly stated, in the
 
 Powers
 
 case in which the court upheld the constitutionality of an amendatory statute withdrawing a ten-year tax exemption previously granted to certain qualifying railroads (191 U. S., at p. 387):
 
 “
 
 The broad ground in a case like this ”, wrote Mr. Justice Holmes,
 
 “
 
 is that, in view of the subject matter, the legislature is not making promises, but framing a scheme of public revenue and public improvement. In announcing its policy and providing for carrying it out it may open a chance for benefits to those who comply with its conditions, but it does not address them, and therefor it makes no promise to them. It simply indicates a course of conduct to be pursued, until circumstances or its views of policy change. It would be quite intolerable if parties not expressly addressed were to be allowed to set up a contract on the strength of their interest in and action on the faith of a statute, merely because their interest was obvious and their action likely, on the face of the law.”
 

 Turning to the case before us, there is nothing in the 1954 legislation to support the idea of a contract with the Long Island or any other particular railroad. Its reference throughout is to bankrupt railroads in general. Addressing no specific railroads, it is directed to “ a [i.e., any] railroad redevelopment corporation ”, authorizing it to raise fares. It is true that the statute may be said to have been tailor-made with the situation of the Long Island in mind, but this was also true of the 1951 version of the Railroad Redevelopment Law (L. 1951, ch. 359) which was apparently adopted without consultation. That the Legislature had a particular situation in mind does not alter the character of what is
 
 “
 
 general ” legislation and render it a special act. (See, e.g.,
 
 Matter of McAneny
 
 v.
 
 Board of Esti
 
 
 *513
 

 mate,
 
 232 N. Y. 377, 393;
 
 People ex rel. New York Elec. Lines Co.
 
 v.
 
 Squire,
 
 107 N. Y. 593, 601;
 
 Maller of New York El. R. R. Co.,
 
 70 N. Y. 327, 351.)
 

 It is equally immaterial that the 1954 enactment was the result of negotiations with the plaintiffs. Conferences looking toward the enactment of legislation are not unknown either in legislative halls or in executive mansions, and it would startle legislators and other public officials if it were suggested that legislation which stems from discussion creates contracts with the State. The legislation did no more than afford bankrupt corporations an opportunity to benefit by a scheme which the Legislature adopted in the public interest and for the public welfare, and, since it did not
 
 “
 
 address ” itself to any specific railroads and ‘1 therefor * * * [made] no promise to them”
 
 (Wisconsin & Michigan Ry. Co.
 
 v.
 
 Powers,
 
 191 U. S. 379, 387,
 
 supra),
 
 it may not be treated as a contract.
 

 It is significant that on other occasions, when the matter would have been of considerable consequence, neither the Long Island nor the Pennsylvania even suggested the existence of a contract with the State. On the contrary, they strenuously opposed the idea. For instance, in the Long Island’s petition to the United States District Court for dismissal of the bankruptcy proceedings, there was mention of ‘
 
 ‘
 
 discussions ’ ’, but not a word that the State had entered, or was to enter, into an agreement with the Long Island or the Pennsylvania.
 
 [3]
 
 In point of fact, when the City of New York advanced the contention in these Federal proceedings that chapter 824 was a private bill granting tax exemption—and, in consequence, invalid (N. Y. Const., art. XVI, § 1)—the plaintiffs, repudiating the idea,
 
 *514
 
 vigorously and explicitly urged that the statute was “a general and not a special act ”.
 
 [4]
 

 Beyond this, the Long Island continued to take this precise view — that the legislation was general and that it had no contractual arrangement with the State—when later in two cases
 
 (Klein
 
 v. Long;
 
 Is. R. R. Co.,
 
 9 Misc 2d 486;
 
 Gerosa
 
 v.
 
 Long Is. R. R. Co.,
 
 207 Misc. 360), the city sought to annul the tax provisions of the statute as applied to it on the ground that they were violative of constitutional provisions (N. Y. Const., art. Ill, § 17; art. XVI, § 1). In the brief submitted in the
 
 Cerosa
 
 case, counsel for the Long Island wrote: “We do not urge that the Legislature was not cognizant of the plight of defendant [Long Island] railroad or that such was not a principal consideration in the minds of the legislators in enacting this statute. However, the statute is not deprived of its general character- by reason thereof. The particular situation of the defendant railroad simply brought to the attention of the Legislature the need for legislation which would permit the rehabilitation of defendant as well as any other railroad thereafter coming within the defined class.”
 

 In sum, chapter 824 of the Laws of 1954 contains no suggestion of an agreement or the creation of a contractual status and, as we have indicated, this view is fully confirmed by the position which the plaintiffs themselves consistently took in the past. Their earlier contentions make it evident that, had they suggested the existence of a contract, the legislation would have had to face serious constitutional questions, questions which the plaintiffs successfully avoided by expressly denying the very matters they assert today.
 

 Since we have concluded that there was no contract between the State and these plaintiffs, it is unnecessary to consider whether, in any event, the 1958 amendment may be sustained either as an exercise of the police power (see
 
 Indiana ex rel. Anderson
 
 v.
 
 Brand,
 
 303 U. S. 95, 108-109;
 
 Atlantic Coast Line
 
 v.
 
 Goldsboro,
 
 232 U. S. 548, 558;
 
 New Tork & New England
 
 
 *515
 

 R. R. Co.
 
 v.
 
 Bristol,
 
 151 U. S. 556, 567) or of the “ reserved power ” to amend corporate charters. (N. Y. Const., art. X, § 1; General Corporation Law, § 5; see
 
 Matter of Roosevelt Raceway
 
 v.
 
 Monaghan,
 
 9 N Y 2d 293, 307-308, app. dsmd. 368 U. S. 12;
 
 Beloff
 
 v.
 
 Consolidated Edison Co.,
 
 300 N. Y. 11, 19;
 
 Matter of Mount Sinai Hosp.,
 
 250 N. Y. 103, 110;
 
 Close
 
 v.
 
 Glenwood Cemetery,
 
 107 U. S. 466, 476.)
 

 The judgment appealed from should be affirmed, with costs.
 

 Chief Judge Desmond and Judges Dye, Froessel, Van Voorhis, Burke and Foster concur.
 

 Judgment affirmed.
 

 [1]
 

 . Section 307, as amended, provides that applications for increases “ shall be filed and determined in the manner provided in the public service law”. Section 49 of the Public Service Law recites that
 
 “
 
 the commission may give to the hearing and decision of such questions [i.e., rate changes] preference over all other questions pending before it and decide the same as speedily as possible.”
 

 [2]
 

 . The allegation of the complaint which comes closest to suggesting contractual terms is found in paragraph 10 which recites that “ In May 1954 the Pennsylvania and the Authority having theretofore negotiated for several months agreed upon a plan for terminating the bankruptcy of the Long Island and for its rehabilitation * * * the essential terms of which are set forth in a report by the Authority to the Governor ”. The report itself, which is attached to the complaint, does not refer to any contract to be entered into with the State. The legislation creating the Authority gave it no power to make any such contract and the Governor’s letter transmitting the report, as well as his message recommending enactment of the proposed legislation, is equally silent as to any contractual obligations to be assumed by the State.
 

 [3]
 

 . Thus, the petition recited that there were
 
 “
 
 discussions * * * with the Long Island Transit Authority with a view to developing a procedure which, if the various necessary approvals thereof were secured and such procedure successfully carried out, would result in the Debtor [Long Island] being no longer in need of reorganization ”; that the 1954 legislation was enacted as “ a result of such discussions”; and that, “Subject to obtaining all necessary approvals, the Debtor proposes to qualify as a railroad redevelopment corporation”. This is not the language of contract, but rather of intention to take advantage of beneficial legislation. And the Federal court, in granting the Long Island’s petition, referred to the work of the Authority as the undertaking of a study and “ the formulation of ameliorative legislation ”.
 

 [4]
 

 . More specifically, during the course of the hearing on the Long Island’s petition, counsel representing both the Long Island and the Pennsylvania declared that the statute “ purports to cover a general class of railroads * * * that that class is reasonably constituted for the purposes intended to be served by the statute, and that the statute is therefore a general and not a special act ”.