Hancock, Jr., J.
(dissenting). In what, by any measure, must be termed a remarkable decision, the majority today invalidates two prospective general statutes (L 1979, ch 503, and L 1982, ch 55) which pertain to the Property/Casualty Insurance Security Fund, a fund established and maintained for the purpose of protecting individual insureds and injured parties from risk of loss due to the insolvency of insurance companies. A logical analysis of the majority’s action in invalidating these statutes must start with a statement of four important and highly relevant propositions about which there can be no dispute:
(1) it is a fundamental rule of constitutional law that a court will presume an act of the Legislature to be constitutional and will strike it down as unconstitutional "only as a last resort” (Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, 555, affd 344 US 367; see, Cook v City of Binghamton, 48 NY2d 323, 330),
(2) this fundamental rule has particular force where the statute at issue involves regulatory conditions imposed on a business which is already pervasively regulated (see, e.g., New York v Burger, 482 US 691, revg 67 NY2d 338; Energy Reserves Group v Kansas Power & Light, 459 US 400, 411-412),
(3) writing liability and property insurance is and has long been a pervasively regulated business, and
(4) the two statutes in question involve the regulation of the insurance business and the establishment by the State of *593 mandatory prerequisites for its grant of permission to property and casualty insurers to conduct that business within its borders.
The Court’s holding is a blanket declaration that plaintiffs have been deprived of a "property right” in violation of some or all of the following Federal and State constitutional prohibitions: (1) taking of property without compensation, (2) a deprivation of property without due process, (3) an impairment of contractual obligations (US Const, art I, § 10, cl 1; 5th, 14th Amends; NY Const, art I, § 7).
The predicate for its holding of unconstitutionality is the Court’s finding that plaintiff insurance companies possessed a cognizable "property right” in the fund’s statutory arrangement as it existed prior to the effective dates of the amending statutes. This "property right”, the Court holds, precludes the State from giving effect to the prospective legislation altering the previously existing statutory arrangement. It is apparent that under the majority’s theory the "property right” which is essential to its declaration of unconstitutionality (see, Board of Regents v Roth, 408 US 564, 577) stems from enforceable promissory obligations on the part of the State that it would not pass legislation interfering with plaintiffs’ continued enjoyment of the rights which the State had permitted them to have prior to the effective dates of the statutes.[1] Nowhere in the majority’s several responses to this dissent is this critical point challenged. Indeed, in the very first sentence of the opinion the majority seems to concede it.[2]
As will be demonstrated in point I (infra), none of the several statutes pertaining to the fund, taken separately or in combination contains a basis for a finding of any promissory "property right”. Nor is there the slightest indication in this record of any implied promissory obligation based on plaintiffs’ reliance. The majority’s finding that such cognizable *594 promissory "property rights” exist is without any foundation and squarely contradicts Federal and State law dealing with the rights of the State to change the law.
As will be shown in point II (infra), the majority holding that the statutes in question deprived plaintiffs of some promissory property right under one or more of several listed State and constitutional provisions cannot stand because no such "property right” exists in State law (see, Board of Regents v Roth, supra, at 577). But, beyond that, the majority’s conclusion that this purported promise-based "property right” is a sufficient predicate for overcoming the very strong presumption of constitutionality that these two regulatory statutes enjoy establishes a novel, and, I believe, a startling precedent in the field of constitutional taking. This precedent seems to embrace long-abandoned concepts of substantive and economic due process as a justification for striking down regulatory legislation (see, e.g., Nebbia v New York, 291 US 502, 523, 537; Lochner v New York, 198 US 45).
Finally, it will be shown in point III (infra) that this decision conflicts with and therefore overrules a 1985 holding of this Court (Methodist Hosp. v State Ins. Fund, 64 NY2d 365) rejecting a virtually identical constitutional attack on one of two statutes at issue here.
For these reasons, I must dissent. I would affirm the order of the Appellate Division, which upheld the constitutionality of the statutes.
I
The claim of a "property right” on which plaintiffs’ entire theory hinges must find its basis in an enforceable right existing in State law (see, majority opn, at 585). As the court in Board of Regents v Roth (408 US 564, 577, supra) stated, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. * * * Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that *595 secure certain benefits and that support claims of entitlement to those benefits.” (See, Matter of Economico v Village of Pelham, 50 NY2d 120, 125.) A property right of a party in something is the right of that party to enforce an obligation or duty on the part of another party with respect to it (see generally, Holmes, The Common Law, Lecture VII, at 214-215 [1963 ed]). The property right may be the right to enforce a contractual obligation to make someone perform a promised act or respond in damages for not doing so. Obviously, a right —whether it is labeled a "property right” or something else— can only have meaning if there is a corresponding duty which is enforceable under some legal theory.
Here, the "property right” which plaintiffs seek to enforce and the majority recognizes is the obligation of the State not to change the law. There can be no real dispute (see, supra, at 593, n 1) that, regardless of how it is styled, the critical "property right” on which the majority founds its decision depends on the existence of two enforceable promises made by the State: (1) not to pass prospective legislation cutting off plaintiffs’ continued participation in the income to be earned after the effective date of the Laws of 1979 (ch 503) on plaintiffs’ 1970-1973 contributions and (2) not to pass prospective legislation which would have the effect of taking income out of the fund that would otherwise be earned on the corpus, if doing so would contribute to a reduction in the size of the corpus to the point where plaintiffs become bound to make further contributions. Because there is no basis in New York law for enforcing these promissory obligations against the State, there is no cognizable "property right” on which the majority can ground its claim of deprivation under any New York or Federal constitutional provision (see, Board of Regents v Roth, supra, at 577).
A
Let there be no mistake. This case involves a claim that the plaintiffs may block the future effect of legislation which is entirely prospective. Thus, with respect to the Laws of 1979 (ch 503) plaintiffs claim that they have a right to continue to receive the credits or refunds under the previously existing 1969 legislation, as amended in 1973, just as though the Laws of 1979 (ch 503) had not taken effect. Their claim is simply that the State had no right to repeal the provisions of the 1969 legislation and that with respect to income to be earned *596 on the contributions made between 1970 and 1973 they have what amounts to a perpetual annuity. It is this claim to a perpetual annuity on the 1970-1973 contributions which the majority has recognized in its award to plaintiffs of the amount that they would have received if the pre-1979 legislation had continued in effect (majority opn, at 590).
The opinion gives no plausible reason why it accepts this claim. It offers what may be described as a mix of miscellaneous legal theories. For example, it declares that the State should operate with "good faith” and that the legislation, albeit prospective, should somehow be construed as having the effect of retroactive legislation (see, majority opn, at 587-588). This latter claim, of course, is nothing more than an assertion that plaintiffs’ rights to receive future credits or refunds on the 1970-1973 contributions were vested and could not be cut off, i.e., that their right to receive the annuity on this portion of the fund corpus continues ad infinitum. But this claim of vesting comes back full circle to the same underlying contention, the core issue in dispute: that under some legal theory the State had barred itself from giving any effect to legislation which would extinguish plaintiff’s prospective rights to refunds or credits on income earned after August 1, 1979 (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 51 [e], at 97-100).[3]
As another ingredient of its mix, the majority advances what seems to have overtones of a trust or fiduciary theory, although it avoids calling it that. The majority suggests that the responsibilities imposed on the Commissioner of Taxation and Finance as "custodian” for the fund’s safekeeping (see, infra, at 598) create some undefined duty to these plaintiffs, as distinguished from a duty to the public at large or to those members of the public who may have claims against insolvent insurance companies. This theory has no basis in the law. The *597 duties of the Commissioner to act as custodian of the funds and keep them safe are, of course, inherent in his responsibilities — as the public official charged with the fund’s safekeeping —to safeguard these public moneys for the benefit of the public and for the purposes for which the fund was established, i.e., to provide security for injured parties or insureds who suffer losses and have claims against insolvent insurance companies. Nothing in these duties suggests that the Commissioner is entrusted with holding property for the benefit of any private party or entity (see generally, 1 Scott, Trusts § 2.6, at 48; § 14, at 184-185 [4th ed]). Certainly, nothing suggests that the funds are to be held by the Commissioner for the benefit of the plaintiff insurance companies. Significantly, plaintiffs themselves make no such argument. If any group could advance such a claim, it would be the class of injured parties or policyholders, now unidentified, who may at some future time suffer loss because of the insolvency of one or more of the insurance companies. But whatever the merit of this argument, it must be premised on the existence of the very obligation in dispute: that the State had somehow bargained ¿way its fundamental power to prospectively repeal the refund-credit provisions of the 1969 legislation. In these theories taken singly or together as an undifferentiated composite, the majority finds a "property right” of which, it says, plaintiffs have been unconstitutionally deprived.
The majority has also concluded that plaintiffs had a protected property interest of which they were deprived by the Laws of 1982 (ch 55). An analysis of the majority’s basis for the Laws of 1982 (ch 55) "property right” shows immediately that it, too, depends on plaintiffs’ legal right to block the State from passing prospective legislation: i.e., on a legally binding obligation by the State not to pass prospective legislation which would have the effect of depriving the fund of general income, thus contributing to the diminution of the fund below $150 million, the point where plaintiffs would be required to make further contributions (majority opn, at 590).
As with the argument for its Laws of 1979 (ch 503) "property right”, the majority presents a medley of theories for the "property right” it claims was affected by the Laws of 1982 (ch 55). Whether analyzed separately or as a mixture, the various theories do not support a cognizable right under which plain *598 tiffs can deny the State its right to transfer the $87 million of corpus to the general treasury.[4]
Some of the theories under which the majority would invalidate the Laws of 1982 (ch 55) seem to relate to a claimed "property right” in the corpus of the fund, not its income. For example, the majority notes that "the State pledged its faith and credit for the fund’s safekeeping and promised to keep the fund separate and apart from other State moneys” (majority opn, at 587), that the State was obligated "to ensure that the fund’s assets and earnings would be available for their intended purposes” (id., at 587), that "the Commissioner of Taxation and Finance was established as 'custodian’ of the fund (Insurance Law § 333 [6]), a term that implies 'responsibility for the protection and preservation of the thing in custody’ (Black’s Law Dictionary 384 [6th ed] [custody])” (id.), that the Commissioner was limited to "safe investments” of the fund’s assets (id., at 587-588), and that the statutory scheme "viewed as a whole, created in the State obligations to preserve the fund and to use its assets and earnings only for * * * narrow purposes” (id., at 588). Each of these theories suggests that the asserted obligation of the State "to maintain the integrity of the fund in order to protect the contributors from having to replenish the fund unnecessarily” (id., at 590) — on which the majority relies for invalidating the statute (L 1982, ch 55) — is related to a claimed "property right” in the corpus of the fund, not the income.
But plaintiffs do not assert that they have a "property right” in the corpus. And our Court has expressly held that plaintiffs have no such "property right” (see, American Ins. Assn. v Chu, 64 NY2d 379;[5] Methodist Hosp. v State Ins. Fund, *599 64 NY2d 365, 377, supra). Nowhere in the opinion does the majority tell us that the Court has now changed its mind on this critical point. Thus, because plaintiffs can have no legal interest in the fund corpus, the “property right” predicate for invalidating the Laws of 1982 (ch 55) — like the predicate for invalidating the Laws of 1979 (ch 503) — must depend on some binding “promise” to refrain from passing prospective legislation and reducing the fund to below $150 million (see, majority opn, at 577). As will be seen, there is no recognized legal theory for the enforcement of the alleged promissory obligation of the State with respect to either statute.
A contractual obligation may arise from a promise which is either express or implied. In this case, plaintiffs’ contractual claim must be founded on either: (1) an express promise in the statutory language as it existed before the amendments when the contributions were made or (2) some implied promise based on the claim that the contributions were made in reliance on the contributors’ understanding that the statutes as they then existed would not be amended. Plaintiffs can establish no contractual right under either theory. I turn first to an examination of the statutes to see whether there is any language capable of supporting an express promise.
Section 334 (5), as it existed in 1969, provided:
“The superintendent shall allow each insurer credit for, or shall return to each insurer, that portion of the interest earned during the preceding year on the moneys in the [fund] which is allocable to the contributions paid by such insurer pursuant to this section.” (L 1969, ch 189, § 3.)
This law imposed a present obligation on the Superintendent of Insurance. As long as the law remained in effect the Superintendent was obligated either to credit or return to each insurer its proportionate share of the fund’s previous year’s income. As stated, plaintiffs do not claim that the Superintendent did not fulfill his obligations under the statute or that they did not receive all of their refunds or credits during the period before the statute’s repeal in 1979 (L 1979, ch 503). No language in section 334 (5) suggests that the law was intended to impose an obligation on the Superintendent *600 when the law was no longer in effect, or that the Legislature could not exercise its constitutional power to amend or repeal the law. Thus, nothing in the wording of section 334 (5) can give rise to a contractual or promissory right of any nature. The majority opinion does not suggest otherwise.
What about section 333, as it existed in 1969? Former section 333 (6) provided that the fund "shall be separate and apart * * * from all other state moneys, and the faith and credit of the state of New York is pledged for [the fund’s] safekeeping”; that the "commissioner of taxation and finance shall be the custodian of said fund”; and "that moneys of said fund may be invested by the commissioner of taxation and finance only in [limited low-risk investments]”. Significantly, the statute did not provide that the income should be considered a part of the fund.[8] Indeed, it makes no reference at all to disposition of the income or interest generated by the fund. Thus, no language in section 333 can be relied upon to support the contributors’ claimed right to participate in the fund’s income or to require that such income be retained in the fund.[6]
[7]
A review of the provisions concerning another statutorily created fund — the Life Insurance Guaranty Fund (LIGF) — is instructive. The statute governing the LIGF, Insurance Law former § 224 (L 1939, ch 882, as amended by L 1941, ch 481), presently Insurance Law §7504, is quite different from the statutes involved here. Section 7504 (c) provides that the Life *601 Insurance Guaranty Corp., which is charged with administering the LIGF, shall issue certificates showing dates and amounts of contributions made to LIGF. Unlike the fund here, section 7504 (a) expressly prescribes that the "gains and income from investments of the fund shall belong * * * to the contributors” (emphasis supplied). Additionally, section 7504 (e) expressly grants to contributors a reversionary interest in the fund corpus in the event the fund is dissolved "by the repeal of this article or otherwise”. The Legislature’s omission of comparable provisions from the statutes creating the fund in question here is significant. The obvious conclusion is that such omission was intended. (See, Matter of Randy K, 77 NY2d 398, 405, n 4.)
The majority recognizes the differences in the statutes relating to LIGF and the fund involved here (see, majority opn, at 587). Curiously, however, it relies on these differences to support its conclusion that the "statutory provisions may create rights that cannot be extinguished by the State” and that the statutes involved did so (id., at 587). In other words, the majority argues, what the Legislature might have done, but did not do, we should find it intended to do. The majority cites no authority for what it seems to propose as a rule of construction and the logic for it is not apparent.[8]
Nor is there a basis for any suggestion that plaintiffs’ contributions to the fund were made in reliance on some expectancy that the statutes would remain unchanged (majority opn, at 586, 588). Plaintiffs made the contributions because they were mandated by the statute not because of some assurance or belief concerning the disposition of the fund’s income. The statutory provision requiring these contributions is the same as that contained in Insurance Law former § 333 which created the original Motor Vehicle Liability Insurance Security Fund. Subdivision (3) of that statute provided:
"For the privilege of issuing policies insuring against legal liability * * * and in addition to all *602 other requirements of law, every insurer shall pay into the fund [x amount]” (emphasis added).
Compliance with this mandatory provision was simply one of the conditions "in addition to all other requirements of law” imposed as part of the State’s extensive regulation of the insurance industry; if plaintiffs wanted the privilege of doing business in the State they had to make the payments. It is as simple as that.
To suggest that plaintiffs’ contributions were made as part of some bargain or exchange with respect to the anticipated treatment of the income — rather than to comply with a condition required by the sovereign for its permission to conduct the pervasively regulated business of writing insurance policies in the State — belies the record and defies common sense. Is it realistic to think that national insurers, such as Allstate Insurance Co., Government Employees Insurance Co., Liberty Mutual Insurance Co. and State Farm Mutual Insurance Co., were induced to seek permission to transact business in the State of New York because of some tenuous expectancy concerning the State’s management of the fund and that but for that expectancy they would have decided to forego transacting business in one of the largest insurance markets in the Nation? But, in any event, the record contains no evidence of plaintiffs’ claimed reliance, only their bare allegations— hardly enough on which to premise a "property right” as the basis for the majority’s striking down two acts of the Legislature (L 1979, ch 503; L 1982, ch 55) as unconstitutional.
But even assuming that plaintiffs could construct a theory in support of some contractual commitment binding future Legislatures not to alter these statutes, it would still fall far short of the unequivocal and forceful proof required to sustain such a claim under long-settled legal rules. In question here are general statutes of the State of New York enacted by the Legislature for the welfare of the People at large — not private acts intended only to benefit some. It is an established rule and, indeed, a fundamental tenet of our democratic system of government that:
"It is never to be assumed * * * that the state has * * * fettered its power in the future, except upon clear and irresistible evidence that the engagement was in the nature of a private contract, as distinguished from a mere act of general legislation; and that such, in the particular instance, was *603 the actual and deliberate intention of the state authorities.” (People v Roper, 35 NY 629, 633 [emphasis added].)
And further:
“It is true, that the state may, if it will, within the limits prescribed in its organic law, enter into private contracts with its citizens, by which the people and the government are for ever bound; but we are never to construe a general statute as embracing such a purpose, when it is obvious, that it was designed only as an expression of the legislative will for the time being” (id., at 634-635 [emphasis added]).
In a more recent decision which has become a leading case on the point, our Court, following People v Roper (supra), unanimously applied the established rule. We stated:
"If, then, there is a contract in this case, it must be found in the legislation which was enacted. As bearing on this, it is settled that, before a law may be deemed to amount to a contract between the State and a third party, the statutory language must be examined and found to be 'plain and susceptible of no other reasonable construction’ than that a contract was intended. (Stanislaus County v. San Joaquin C. & I. Co., 192 U. S. 201, 208 [other citations omitted].)” (Pennsylvania R. R. Co. v State of New York, 11 NY2d 504, 511 [Fuld, J.]; see also, Cook v City of Binghamton, 48 NY2d 323, 329-330 [Wachtler, J.], supra.)
Nowhere does the majority discuss this basic rule or explain why it does not require a dismissal of plaintiffs’ claims; and nowhere does the majority question the Appellate Division’s unanimous holding as to the rule’s application here. That court stated:
“The principal legislative function is ' "not to make contracts, but to make laws which declare the policy of the state and are subject to repeal when a subsequent legislature shall determine to alter that policy” ’ (supra, at 329, quoting Indiana ex rel. Anderson v Brand, 303 US 95, 100; see, National R. R. Passenger Corp. v Atchison, Topeka & Santa Fe Ry. Co., 470 US 451, 466). Consequently, before a statute will be deemed a contract *604 its language and circumstances must ‘manifest a legislative intent to create private rights of a contractual nature enforceable against the State’ (Cook v City of Binghamton, supra, at 330). The language of the statute must be ‘ ‘‘plain and susceptible of no other reasonable construction” ’ (Pennsylvania R. R. Co. v State of New York, 11 NY2d 504, 511, quoting Stanislaus County v San Joaquin & King’s Riv. Canal & Irrigation Co., 192 US 201, 208)” (Alliance of Am. Insurers v Chu, 154 AD2d 82, 86).
Nothing in the statutes or in the record supports a contractual claim of any kind, let alone one based on "[c]lear and precise language, spelling out a covenant or agreement whereby the State becomes obligated to a third party (see, United States Trust Co. v New Jersey, 431 US 1, 9-10; Patterson v Carey, 41 NY2d 714, 717)”. (154 AD2d, at 86.)
II
If there is one rule that is now ingrained in the doctrine of judicial review of legislative enactments it is this: that an act of the Legislature is presumed to be constitutional and may be struck down only when it is proven to be unconstitutional beyond a reasonable doubt (see, e.g., Cook v City of Binghamton, 48 NY2d 323, 330, supra). Particularly since the Supreme Court’s abandonment of the Lochner era concept of economic due process as a justification for striking down regulatory legislation[9] (see, e.g., Nebbia v New York, 291 US 502, 523, 537, supra), courts have been mindful of this rule in recognition of the basic principle that under the doctrine of separation of powers, it is to their elected representatives, not to the members of the judiciary that the citizens have delegated the power to make the law (see, e.g., People v Broadie, 37 NY2d *605 100, 117, cert denied 423 US 950; Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, 555, supra; see generally, Tribe, American Constitutional Law, at 10-15, 23-26 [2d ed 1988]; Choper, Judicial Review and the National Political Process, at 129-170 [1980]).
Time and again, in hundreds of cases (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [and 1991 Cum Ann Pocket Part] [and all cases cited therein]), we have adhered to the rule in upholding laws against constitutional attack or striking them down. As the Attorney-General properly maintains, the presumption has particular force where the statute at issue — like the statutes in question here — involves regulatory conditions imposed on a business which is already pervasively regulated (see, e.g., New York v Burger, 482 US 691, revg 67 NY2d 338, supra [sustaining a statute authorizing warrant-less inspection of concerns engaged in the business of vehicle dismantling, a "closely regulated” industry, in face of Fourth Amendment challenge]; Methodist Hosp. v State Ins. Fund, 102 AD2d 367, 381-382, and cases cited [Alexander, J.], affd 64 NY2d 365, supra; Town of Hempstead v Goldblatt, 9 NY2d 101, 105, affd 369 US 590; see also, Matter of Malpica-Orsini, 36 NY2d 568, 570).[10]
The majority’s critical holding of unconstitutionality is premised on the "assumption” that plaintiffs possessed some legally cognizable rights which were taken — i.e., rights of which they were deprived by the Legislature’s actions in amending the law. This premise is not established. Nothing was taken. In holding these statutes unconstitutional — relying, it appears, to a large extent on principles of "fairness” (majority opn, at 586) and a litany of other justifications — the majority has established a new and, I suspect, troublesome precedent in the field of judicial review of regulatory legislation. This precedent is directly contrary to the rule that "courts [may not] substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation.” (Matter of Malpica-Orsini, supra, at 570.)
*606 I turn to a discussion of the effect of today’s decision on our holding in Methodist Hosp. v State Ins. Fund (64 NY2d 365, supra).
Ill
On February 21, 1985, this Court unanimously held that insured employers which had paid premiums for workers’ compensation coverage into the State Insurance Fund (SIF) had no property interest and no right, based on a contractual or fiduciary obligation, with respect to the income or interest earned on the moneys they had paid into the fund by way of premiums (see, Methodist Hosp. v State Ins. Fund, 64 NY2d, supra, at 376-377). This fund, the Court held, "being State money the State could have simply taken * * * with no strings attached.” (Id., at 377 [emphasis added].) Thus, we concluded that no legal or equitable rights of the policyholders were affected by the transfer pursuant to the identical statute at issue here (L 1982, ch 55) of $193 million to the general treasury even though that transfer deprived the SIF of the income and interest on the transferred funds and thus resulted in the policyholders’ having to pay higher premiums (id., at 373, n 1, 377). In our unanimous affirmance of the Appellate Division order, we expressly noted our agreement with the Appellate Division’s reasons for rejecting the policyholders’ contractual claims (id., at 377). That court held:
"The contention of plaintiffs that they possess certain contractual rights in respect to the level of insurance premium rates and in respect to the required amount of reserves and the disposition of such reserves which are impaired by chapters 55 and 404, is not supported by either the facts or the law. Clearly, nothing in the policies of insurance themselves can fairly be interpreted as conferring any such contractual rights. Nor can it reasonably be said that any of the provisions of the Workers’ Compensation Law establish any such property interest in the funds of SIF nor impose any contractual obligations upon the State in respect to the funds of SIF, which are substantially impaired by the challenged legislation.” (102 AD2d, at 378-379 [Alexander, J.].)[11]
*607 The Court decides today that the Legislature’s actions are "invalid to the extent that they deprive the Property and Liability Insurance Security Fund of income on contributions made by insurers pursuant to the 1969 legislation” (majority opn, at 589). With respect to the $87 million of the fund’s corpus transferred to the State’s general fund in 1982 (L 1982, ch 55), this Court now holds that:
"[T]he transfer did not directly reduce the fund’s value for purposes of determining whether contributions should resume and therefore did not, by itself, cause any harm to plaintiffs. Plaintiffs were harmed, however, by the loss of income that could have been generated by such moneys had they remained in the fund. It is not clear on this record whether this income would have prevented the fund’s value from dropping below the level at which new contributions were required, but its loss undoubtedly contributed to the fund’s diminution.
"We conclude, therefore, that the State must account to the fund for the lost income and, until the moneys are returned to the fund, must continue to pay interest on the amount transferred at a rate equivalent to that which could be earned by the fund if those moneys were invested as authorized by section 333 (6). ” (Majority opn, at 590-591 [emphasis added].)
Precisely the same claim which the Court in Methodist *608 Hosp. found insufficient as a basis for a contractual or property right or for a claim of constitutional deprivation the Court now finds sufficient. The technical and insignificant differences between the State Insurance Fund and the Property/Casualty Insurance Security Fund relied on by the majority (majority opn, at 589) are of no consequence (see, supra, at 599-600). The theory of each case is the same. The State established each fund under its unquestioned authority to regulate the insurance industry. To one fund, the Property/Casualty Insurance Security Fund, the State, exercising its regulatory authority, required the participating insurance companies, the plaintiffs here, to make contributions. To the other fund, the State Insurance Fund, the State required insured employers to pay workers’ compensation premiums. The funds were and are maintained by the State for the purpose for which the funds were established — providing security for losses to injured persons or insureds resulting from insurers’ insolvencies (the Property/Casualty Insurance Security Fund) and providing a fund to secure workers’ compensation payments (the State Insurance Fund).
In Methodist Hosp., the income from the $190 million transferred was lost to the fund, and, as a result, the plaintiffs had to make higher premium payments (see, Methodist Hosp. v State Ins. Fund, 64 NY2d 365, 373, n 1, 377, supra). In the case before us, the income on the transferred $87 million was lost to the fund, with the result that, because of heavier loss payouts, the fund fell below the point where plaintiffs were required to make additional contributions. In Methodist Hosp. we held that the transfer and the resultant loss of income gave the employers no right to complain. Today the Court holds that the loss of income from the transfer of the $87 million deprives plaintiffs of a "property right” and amounts to a constitutional taking which justifies the extensive relief which has been granted. The two holdings cannot stand together, and I conclude, therefore, that Methodist Hosp. has been overruled.
IV
Conclusion
It is basic law that the sovereign is empowered to enact measures governing the conduct of a heavily regulated business, subject only to the limitation that those measures have a rational basis (see, e.g., New York v Burger, 482 US 691, supra; *609 Energy Reserves Group v Kansas Power & Light, 459 US 400, supra). The statutes in question here, enacted pursuant to the State’s authority to regulate a closely controlled industry, pertain to the Property/Casualty Security Insurance Fund and the requirement that participating insurers make contributions to that fund as a condition of their doing business in the State.
It is not questioned that the Legislature had and has broad discretion in setting the amounts of contributions to the fund and in establishing the method by which those amounts are to be determined. Obviously, as is demonstrated in this case, the amount of contributions that the Legislature may require and what disposition it may permit of any unneeded surplus will depend on many variables — particularly the state of the economy. In good times, with few insolvencies of insurance companies, and fewer budgetary constraints than in 1982 or today, no contributions may be necessary and the Legislature may deem it in the public interest to allow a credit or refund of portions of the surplus. In poorer economic times the Legislature may, in the exercise of its judgment, decide that such course would not serve the public interest.
No party has ever suggested that any of the several statutes and amendments passed by the Legislature with respect to the fund lacks a rational basis. The majority makes no such suggestion. Indeed, it concedes that the Legislature has wide leeway in the management of the fund and is free to make changes in the law and adjustments with respect to the fund’s administration in the future (see, majority opn, at 589). Yet, today’s decision constitutes a substantial interference in the State’s management of this fund and a deep intrusion into the power of the State to regulate the insurance industry.
The legal analysis to support this intrusion — rooted, it seems, in general concepts of fairness (majority opn, at 586) and "good faith” (id., at 587) and in concern for the protection of plaintiff insurance companies’ "property rights” — necessarily reflects some notion of substantive or economic due process, a notion which, I had thought, had long since been rejected as antithetical to modern constitutional doctrine (see, e.g., Nebbia v New York, 291 US 502, 523, 537, supra; Seawall Assocs. v City of New York, 74 NY2d 92, 117-118 [Bellacosa, J., dissenting], cert denied sub nom. Wilkerson v Seawall Assocs., — US —, 110 S Ct 500).
To balance any fairness argument that might be made for *610 the protection of these insurance companies’ property rights, one could, of course, argue that it is not fair to the public to take an estimated $37 million (see, respondent’s brief, at 7) out of the treasury where it might be expended on needed programs. But this is not the point. The point is that while long-accepted concepts of fairness and fundamental justice are at the foundation of many of our constitutional rules, constitutional law is still law. One principal tenet of that law is the doctrine of separation of powers: that the judicial branch shall not encroach upon the prerogative of the Legislature to make the laws, particularly in the area of establishing reasonable conditions on heavily regulated businesses. This decision stands as a precedent that is contrary to that tenet. It will be law — law which, if it does not affect the State’s right to manage other funds (as the majority assures us that, for some reason, it will not [majority opn, at 578]), will certainly stand for a significant and novel proposition in the law of separation of powers.
If this decision is based on law, the majority cites no authority for it. I have found no precedent for it in this or any other jurisdiction, only precedent against it (see, e.g., Methodist Hosp. v State Ins. Fund, supra). If it is based on policy, it is a policy which, to my knowledge, does not exist in this State, is beyond the power of this Court to create, and, I most respectfully submit, a policy which is not well founded.
I, therefore, dissent. I would affirm essentially for the reasons stated in the unanimous opinion at the Appellate Division (154 AD2d 82).
Judges Simons, Kaye, Bellacosa and Kooper* concur with Chief Judge Wachtler; Judge Hancock, Jr., dissents and votes to affirm in a separate opinion in which Judge Titone concurs; Judge Alexander taking no part.
Order reversed, etc.

. This case has nothing whatsoever to do with unpaid refunds or credits due to plaintiffs prior to August 1, 1979, the effective date of the Laws of 1979 (ch 503). Whatever refunds or credits were due pursuant to the previously existing 1969 legislation plaintiffs have received. This is not in dispute. The statutes in question are prospective, not retroactive. The decision pertaining to the 1979 statute relates solely , to plaintiffs’ claimed rights to receive future income generated on contributions made between 1970 and 1973.

. "The integrity of the State government, upon which the public is entitled to rely, requires, at the very least, that the State keep its lawfully enacted promises. ” (Majority opn, at 577 [emphasis added].)

. The two cases cited by the majority discussing the claimed "retroactivity” of these statutes are simply not on point (see, Matter of Hodes v Axelrod, 70 NY2d 364 [discussing the vested rights doctrine — that a judgment, after it becomes final, may not be affected by subsequent legislation— as it applied to an amendment of Public Health Law § 2806 (5) which was explicitly made retroactive by the Legislature; court upheld statute notwithstanding retroactive affect]; Matter of Chrysler Props. v Morris, 23 NY2d 515 [discussing vested rights doctrine as it applied to an amendment of the Tax Law which expressly authorized the City of New York to obtain judicial review of New York State Tax Commission determinations which were unreviewable on the date the enactment was amended; court held statute as applied to those final determinations was unconstitutional]).

. It is noteworthy that no one, including plaintiffs, challenged or questioned the Legislature’s amendment of the fund’s statutes in 1973 under which income on pre-1969 contributions was taken from the fund and credited to the general treasury (L 1973, ch 861, §§ 10, 11) (majority opn, at 581). Not surprisingly, no plaintiff has voiced an objection with respect to that portion of the 1969 amendment which provided that income earned on new contributions would be taken out of the fund and credited or returned to the insurance companies (id., at 580). Plaintiffs’ present alternative position — that the State was prohibited from taking out of the fund any income earned on the corpus to the extent that it reduced the fund to the point where additional contributions were required (id., at 588) — is thus inconsistent with their prior positions.

. In American Ins. Assn. v Chu, our Court held plaintiffs’ challenge to the transfer of $87 million from the Property and Liability Insurance Security Fund pursuant to chapter 55 of the Laws of 1982 was not ripe for *599 review. In short, the Court held that plaintiffs were not injured by the mere transfer of the funds (64 NY2d, at 386). In so holding, the Court rejected plaintiffs’ argument that they had a property interest in the trust corpus (plaintiffs’ brief, at 27-35, vol 2, NY Court of Appeals Cases on Briefs [1985]).

. In sharp contrast, the former statutes involving predecessor funds (see, Insurance Law former §330 [L 1938, ch 471, as amended]) expressly provided that the fund consisted of payments made to the funds "together with interest and accretions earned”. Of course, the income earned on Property and Liability Insurance Security Fund moneys was never considered fund property as, even dating back to 1969, provision for the allocation of that interest outside the fund existed (see, Insurance Law former § 334).

. The "separate and apart”, "faith and credit” and "custodian” provisions of former section 333, on which the majority relies to support its conclusion that petitioners have a property interest in continued refunds and credits on prior contributions, remain essentially unchanged, and are presently found in Insurance Law § 7607. Under the present scheme, the majority concedes that the State "no doubt” has the power to limit contributors’ participation in future income earned by future contributions by the "simple expedient of repealing the provision which gives rise to it”, i.e., former section 334 (majority opn, at 585). This would be so even though former section 333 continues to remain essentially unchanged as it is under the present scheme. Thus, it is obvious that even the majority must concede that the provisions of former section 333 are insufficient standing alone to predicate the finding of a property right.

. The majority’s reasoning appears directly contrary to the basic rationale underlying the accepted rule of construction ”expressio unius est exclusio alterius” (McKinney’s, Cons Laws of NY, Book 1, Statutes § 240)— i.e, that when the Legislature includes something in one statute but excludes it from another it is presumed to have intended the exclusion. Indeed, this is the precise logic of the Attorney-General’s argument with respect to the contrasting provisions of Insurance Law § 7504 — that the Legislature obviously knows how to create a property interest in a fund and it does so expressly when it wants to do so.

. See, e.g., Lochner v New York (198 US 45 [invalidating statute setting maximum working hours for bakers], particularly dissenting opn, Holmes, J., at 74-76, and dissenting opn, Harlan, White and Day, JJ., at 65-74, and statement at 68 that ”[i]f there be doubt as to validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation”); Allgeyer v Louisiana (165 US 578, 591 [striking down Louisiana statute imposing fine for effecting marine insurance with an insurance company not licensed in the State]); Adkins v Childrens Hosp. (261 US 525 [striking down legislation setting minimum wages for women in District of Columbia], particularly dissenting opn, Holmes, J., at 567-571).

. Unquestionably, the insurance industry, like the automobile dismantling business in New York v Burger (482 US 691, revg 67 NY2d 338) and the utility in Energy Reserves Group v Kansas Power & Light (459 US 400, 411-412), cited in Methodist Hosp. v State Ins. Fund (102 AD2d 367, 381-382), is a "closely regulated” industry (see, e.g., Insurance Law former §§ 104, 201, 207, 301, 306, 307, and other provisions in the four volumes of the Insurance Law in McKinney’s Cons Laws and two volumes of the Codes, Rules and Regulations covering the insurance business in 11 NYCRR).

. The Appellate Division’s reasoning for its holding was this:
*607 "a statute will itself be treated as a contract when its language and the circumstances manifest a legislative intent to create private rights of a contractual nature enforceable against the State.” (Cooke v City of Binghamton, 48 NY2d 323, 330.)
"[B]efore a law may be deemed to amount to a contract between the State and a third party, the statutory language must be examined and found to be 'plain and susceptible of no other reasonable construction’ than that a contract was intended.” (Pennsylvania R. R. Co. v State of New York, 11 NY2d 504, 511.)
"We find nothing in the language of those provisions of the Workers’ Compensation Law * * * that [would] constitute 'clear and irresistible evidence’ that the Legislature intended to 'fetter * * * its power in the future’ in respect to the uses to be made of SIF funds or in respect to the level of reserves to be maintained for policy claims or premium rates for the policies issued by SIF or the payment of dividends.” (102 AD2d 367, 379 [Alexander, J.].)

 Designated pursuant to NY Constitution, article VI, § 2.